892 A.2d 479

James J. MACKEY, et al.

v.

COMPASS MARKETING, INC.

Misc. No. 4, Sept. Term, 2005.

Court of Appeals of Maryland.

Feb. 9, 2006.

Anthony Herman (Robert J. Lundman, Covington & Burling, Washington, DC), Lawrence S. Robbins (Alison C. Barnes, Max Huffman, Robbins, Russell, Englert, Orseck & Untereiner, LLP, Washington, DC, Herbert Better, Sean Vitrano, Zuckerman Spaeder, LLP, Baltimore, on brief), for appellants.

Jeffrey Jacobovitz (Schiff Hardin, Washington, DC), Ellen S. Cooper, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief as amicus), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

RAKER, J.

In this Certified Question case, pursuant to the Maryland Uniform Certification of Questions of Law Act, Maryland Code (1974, 2002 Repl.Vol., 2004 Cum.Supp.), §§ 12–601 through 12–613 of the Courts and Judicial Proceedings Article, and Maryland Rule 8–305, the United States District Court for the District of Maryland has certified the following questions of Maryland law:

"(1) Whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law?"

"(2) If Maryland recognizes the conspiracy theory of jurisdiction, what elements must a plaintiff allege for a court to have jurisdiction over the out-of-state defendant under that theory?"

Our answer to the first question shall be YES, and we shall answer the second question by adopting the standard articulated in *Cawley v. Bloch,* 544 F.Supp. 133 (D.Md.1982).

## I.

We recite the facts as set out in the certification order.

"This action arises from an alleged conspiracy between Defendants to cut Plaintiff Compass Marketing Inc.'s brokerage commissions and otherwise interfere with Compass' business. Compass filed a complaint against defendants Schering–Plough Corp., Schering–Plough Health Care Products, Inc., Schering–Plough Health Care Products Sales Corp. (sometimes referred collectively as Schering–Plough), Wyeth (Wyeth was previously known [as] the Whitehall–Robins Healthcare Division of American Home Products Corporation, but is referred to herein as Wyeth), James J. Mackey, and Samuel Severino.

"Plaintiff's complaint was filed in May 2004 in the U.S. District Court for the District of Maryland. Schering–Plough and Wyeth answered denying liability. Defendants Severino and Mackey each moved to dismiss the Complaint against them claiming, among other grounds, lack of jurisdiction over them personally under the Maryland long arm statute. On March 25, 2005, this Court granted the motion in part, with leave for Plaintiff to file an amended complaint, but denied the motion without prejudice on the issue of personal jurisdiction, deciding to certify the issue of whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law to the Maryland Court of Appeals.

"The allegations stated below are taken from plaintiff's First Amended Complaint. At this preliminary stage, this Court has not made any findings of fact regarding the alleged conspiracy or any other facts set forth in the First Amended Complaint. Defendants Schering–Plough and Wyeth deny the existence of any conspiracy or liability and deny many of the specific allegations set forth below, and defendants Mackey and Severino have not answered the complaint because they contest this Court's jurisdiction over them.

"Schering–Plough and Wyeth are in the business of manufacturing and distributing pharmaceutical and other consumer health care products in the United States and throughout the world. Schering–Plough and Wyeth do not dispute that they are each subject to jurisdiction in Mary-

land. Compass is a Maryland based broker in the business of marketing and brokering consumer health care products and other products. Some but not all of Schering–Plough and Wyeth goods brokered by Compass are delivered by those companies to customers in Maryland. Sam Severino was, at the time, Director, Special Markets, of what is now Wyeth; James Mackey was and is Senior Vice President of Sales of Schering–Plough. At the time of relevant events, and for several years previously, Compass brokered consumer health care products for both Schering–Plough and Wyeth pursuant to separate agreements.

"In January 2001, Severino met with Compass in Maryland to negotiate a cut in the brokerage commission paid by Wyeth to Compass, but upon learning that Schering–Plough was paying Compass an even higher brokerage fee, Severino decided not to cut Compass' brokerage fee at that time. Shortly thereafter, Severino and Mackey communicated concerning cutting Compass' brokerage commissions. Mackey and Severino were long-time friends and/or business colleagues, and just prior to his employment at Schering–Plough, Mackey worked at Wyeth and was Severino's superior. Mackey told Severino to meet with Thomas Moeller, Vice President of Sales at Schering–Plough responsible for the division which included Compass, to discuss jointly cutting the brokerage fees that Wyeth and Schering–Plough were paying to Compass; and that Mackey told Moeller to meet with Severino, to discuss jointly cutting the brokerage fees that Wyeth and Schering–Plough were paying to Compass. Sometime prior to March 30, 2001, Severino and Moeller met at a trade event, held at a location other than in Maryland, and reached an agreement for Wyeth and Schering–Plough to jointly cut the brokerage fees that Wyeth and Schering–Plough were paying to Compass.

"On March 30, 2001, Compass received a telephone call from Peggy Smith of Schering–Plough, informing Compass that its commissions from Schering–Plough were being cut to four percent for Compass' largest account only. Thereafter, Compass received a letter from Schering–Plough, dated

April 5, 2001, confirming that Compass' commissions from Schering–Plough were cut to four percent, effective April 2, 2001, not only for Compass' largest account, but for all of Compass' business (excluding new customers for the first 6 months). On or about April 2, 2001, Compass received a letter from Wyeth, signed by Severino and dated March 30, 2001, informing Compass that its commissions from Wyeth were being cut to three percent for its largest account, effective May 1, 2001 (Compass' commissions on other existing Wyeth's [sic] accounts would be five percent).

"Compass sought to have Schering–Plough not put the commission cuts into effect, but was unsuccessful. The cuts went into effect in June and July 2001, when Compass received in Maryland the first reduced commission payments from Wyeth and Schering–Plough respectively."

## II.

Appellants Mackey and Severino argue before this Court that Maryland law does not recognize the conspiracy theory of jurisdiction because it is inconsistent with the plain language of the Maryland "long-arm" statute, Md.Code (1974, 2002 Repl.Vol., 2005 Cum.Supp.), § 6–103(b) of the Courts and Judicial Proceedings Article.[1] They argue further that the conspiracy theory violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by not satisfying the minimum contacts test required by *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny because it permits the contacts of one person with the forum state to serve as the contacts of another person for purposes of the minimum contacts test.

Appellee Compass Marketing urges this Court to recognize the conspiracy theory. In response to appellants' arguments, appellee notes that the majority of jurisdictions that have considered this issue have recognized the conspiracy theory of

---

1. Unless indicated otherwise, all subsequent statutory references herein shall be to Md.Code (1973, 2002 Repl.Vol., 2005 Cum.Supp.), Courts and Judicial Proceedings Article.

jurisdiction. Appellee recommends that we adopt the standard set out in *Cawley v. Bloch*, 544 F.Supp. 133 (D.Md.1982). Appellee contends that *Cawley*'s requirement that it be reasonable for the co-conspirators to expect that their contemplated conspiracy will lead to consequences in a particular forum gives the co-conspirators fair warning sufficient to satisfy due process concerns that they could be subject to the forum's jurisdiction because of acts done in furtherance of the conspiracy.

### III.

The question of whether Maryland recognizes the conspiracy theory of jurisdiction as a matter of state law presents an issue of first impression for this Court. It is clear today that physical presence within a state is not a necessary prerequisite to the proper assertion of personal jurisdiction and that under most states' long-arm statutes, certain acts and effects of those acts may be the basis for a court to exercise jurisdiction of a nonresident as well as a person who has not physically entered within the territorial borders of the state.

Courts have drawn routinely from the substantive law of agency to justify the exercise of personal jurisdiction over nonresident defendants. Imputation, or attribution, of jurisdictional contacts is not a new notion. It is long-established that personal jurisdiction may be exercised over a nonresident defendant on the basis of the actions of the nonresident defendant's agent. Maryland's long-arm statute explicitly grants jurisdiction over a principal based on acts performed through an agent. See § 6–103(b) (providing for exercise of personal jurisdiction over someone who performs acts enumerated in statute personally or "by an agent").[2] Since the

---

**2.** The Maryland Long–Arm Statute, Md.Code (1974, 2002 Repl.Vol., 2005 Cum.Supp.), § 6–103 of the Courts and Judicial Proceedings Article, provides as follows:

"(a) If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

inception of the *International Shoe* line of jurisprudence, the Supreme Court has not expressed any doubt that the acts of corporate agents may be attributed to a corporation for purposes of determining whether personal jurisdiction is proper over the principal. *See Int'l Shoe*, 326 U.S. at 316–19, 66 S.Ct. at 158–60 (holding that, because "the corporate personality is a fiction," whether a corporation's contacts with a forum are sufficient to subject it to suit in that forum is determined by reference to the "activities carried on in its behalf by those who are authorized to act for it").

Analogous to the agency concept of jurisdiction is the conspiracy theory of jurisdiction. Under this theory, an out-of-state party involved in a conspiracy who would lack sufficient, personal, "minimum contacts" with the forum state if

(b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

(c)(1)(i) In this subsection the following terms have the meanings indicated.

(ii) 'Computer information' has the meaning stated in § 22–102 of the Commercial Law Article.

(iii) 'Computer program' has the meaning stated in § 22–102 of the Commercial Law Article.

(2) The provisions of this section apply to computer information and computer programs in the same manner as they apply to goods and services."

Subsequent references to "the long-arm statute" shall refer to this section.

only the party's individual conduct were considered nevertheless may be subject to suit in the forum jurisdiction based upon a co-conspirator's contacts with the forum state. The basic premise of the conspiracy theory of personal jurisdiction is that certain acts of one co-conspirator that are done in furtherance of a conspiracy may be considered to be the acts of another co-conspirator for purposes of determining whether a forum state may exercise personal jurisdiction over the other co-conspirator. Put differently, the conspiracy theory permits certain actions done in furtherance of a conspiracy by one co-conspirator to be attributed to other co-conspirators for jurisdictional purposes.

Courts around the country have utilized conspiracy concepts to establish personal jurisdiction. *See, e.g., Leasco Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972).[3]

---

**3.** The highest courts of the states of Delaware, Florida, Minnesota, Tennessee, and South Carolina have recognized the conspiracy theory of jurisdiction. *See Chenault v. Walker,* 36 S.W.3d 45 (Tenn.2001); *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.,* 752 So.2d 582 (Fla.2000); *Hammond v. Butler, Means, Evins & Brown,* 300 S.C. 458, 388 S.E.2d 796 (1990); *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.,* 449 A.2d 210 (Del.1982); *Hunt v. Nevada State Bank,* 285 Minn. 77, 172 N.W.2d 292 (1969). The Texas Supreme Court has rejected the conspiracy theory. *See Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769 (Tex.1995).

Intermediate state appellate courts in Illinois, New Mexico, Georgia, and New York have recognized the conspiracy theory. *See Santa Fe Technologies, Inc. v. Argus Networks, Inc.,* 131 N.M. 772, 42 P.3d 1221 (2001); *Cameron v. Owens–Corning Fiberglas Corp.,* 296 Ill.App.3d 978, 231 Ill.Dec. 55, 695 N.E.2d 572 (1998); *Rudo v. Stubbs,* 221 Ga.App. 702, 472 S.E.2d 515 (1996); *Reeves v. Phillips,* 54 A.D.2d 854, 388 N.Y.S.2d 294 (1976). Intermediate state appellate courts in California and Washington have rejected the conspiracy theory. *See Hewitt v. Hewitt,* 78 Wash.App. 447, 896 P.2d 1312 (1995); *Mansour v. Super. Ct. of Orange County,* 38 Cal.App.4th 1750, 46 Cal.Rptr.2d 191 (1995).

Many federal courts have recognized the conspiracy theory in various forms. *See, e.g., Textor v. Bd. of Regents,* 711 F.2d 1387 (7th Cir.1983); *Remmes v. Int'l Flavors & Fragrances, Inc.,* 389 F.Supp.2d 1080 (N.D.Iowa 2005); *In re Vitamins Antitrust Litig.,* 270 F.Supp.2d 15 (D.D.C.2003); *Gen. Motors Corp. v. Ignacio Lopez de Arriortua,* 948 F.Supp. 656 (E.D.Mich.1996); *Cawley,* 544 F.Supp. at 135; *Vermont Castings, Inc. v. Evans Products Co.,* 510 F.Supp. 940 (D.Vt.1981); *Gemini Enterprises, Inc. v. WFMY Television Corp.,* 470 F.Supp. 559 (M.D.N.C.1979); *McLaughlin v. Copeland,* 435 F.Supp. 513 (D.Md.

Courts adopting the conspiracy theory of personal jurisdiction have recognized that this use of the fact of a conspiracy to attribute the contacts of one co-conspirator to another co-conspirator for jurisdictional purposes is an extension of the principle that the acts of one civil co-conspirator are attributed to other co-conspirators for purposes of determining the civil liability of the participants in the conspiracy. *See, e.g., Textor,* 711 F.2d at 1392 (noting that "[t]he 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of the conspiracy may be attributed to the other members of the conspiracy.' " (quoting *Gemini Enterprises,* 470 F.Supp. at 564) (alterations in original)).

 It is well established in Maryland law that a conspirator can be liable for the conduct of a co-conspirator. A civil conspiracy has been defined in Maryland as "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper,* 385 Md. 1, 24, 867 A.2d 276, 290 (2005) (quoting *Green v. Wash. Sub. San. Comm'n,* 259 Md. 206, 221, 269 A.2d 815, 824 (1970)). The plaintiff must prove an unlawful agreement, the commission of an overt act in furtherance of the agreement, and that as a result, the plaintiff suffered actual injury. *Id.* at 25, 867 A.2d at 290. The unlawful agreement is not actionable by itself; rather, the "[t]ort actually lies in the act causing the harm" to the plaintiff. *Id.* Thus, civil conspiracy is not "capable of independently sustaining an award of damages in the absence

---

1977). Others have declined to adopt it, holding that it is inconsistent with due process. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.,* 307 F.Supp.2d 145 (D.Me.2004); *Steinke v. Safeco Ins. Co. of Am.,* 270 F.Supp.2d 1196 (D.Mont.2003); *Insolia v. Philip Morris, Inc.,* 31 F.Supp.2d 660 (W.D.Wis.1998); *Karsten Mfg. Corp. v. U.S. Golf Ass'n,* 728 F.Supp. 1429 (D.Ariz.1990); *Kipperman v. McCone,* 422 F.Supp. 860 (N.D.Cal.1976).

of other tortious injury to the plaintiff." *Id.* (internal citations and quotations omitted).

■ In the often cited case of *Cawley v. Bloch,* 544 F.Supp. 133, 135, (D.Md.1982), the United States District Court for the District of Maryland discussed the conspiracy theory of jurisdiction. Judge Joseph H. Young explained that the conspiracy theory of jurisdiction is based on two principles: (1) that the acts of one co-conspirator are attributable to all co-conspirators, and (2) that the constitutional requirement of minimum contacts between non-resident defendants and the forum can be met if there is a substantial connection between the forum and a conspiracy entered into by such defendants. The court articulated the theory as follows:

"Under that doctrine, when

(1) two or more individuals conspire to do something

(2) that they could reasonably expect to lead to consequences in a particular forum, if

(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and

(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum."

*Id.* at 135.

We shall recognize this version of the theory, based on the premise that one co-conspirator is acting as the agent of the others, and that those acts are acts of the other co-conspirator done "by an agent" within the meaning of § 6–103(b) of the Maryland long-arm statute.

■ We now turn to the issue posed by the first certified question: whether Maryland recognizes the conspiracy theory of jurisdiction. Determination of personal jurisdiction is a two-step process. First, the requirements under the long-arm statute must be satisfied, and second, the exercise of

jurisdiction must comport with due process. Maryland has construed our long-arm statute to authorize the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause. *See, e.g., Beyond v. Realtime,* 388 Md. 1, 15, 878 A.2d 567, 576 (2005); *Geelhoed v. Jensen,* 277 Md. 220, 224, 352 A.2d 818, 821 (1976). Thus, the evaluation becomes one of determining whether the defendant's actions satisfy the minimum contacts required by due process so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. at 154. The Court must be assured that defendant's contacts with Maryland "are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Although this question is ultimately one of Maryland statutory law, its resolution requires us to first consider whether the conspiracy theory of personal jurisdiction is consistent with the Due Process Clause. This is so for two reasons. First, if the conspiracy theory were inconsistent with due process, that inconsistency would require us to reject the conspiracy theory as an interpretation of the long-arm statute. *See Nationsbank v. Stine,* 379 Md. 76, 86, 839 A.2d 727, 733 (2003) (in deciding between competing constructions of a statute, we prefer the construction that avoids raising a constitutional issue). Maryland courts, of course, would not exercise jurisdiction over a non-resident defendant if it were inconsistent with due process. Second, as noted above, we interpret the long-arm statute in light of the intent of the General Assembly to extend personal jurisdiction to the limits permitted by the Due Process Clause.

### A. Due Process and the Conspiracy Theory of Personal Jurisdiction

We conclude that the conspiracy theory of personal jurisdiction is consistent with the Due Process Clause of the Fourteenth Amendment. The central due process issue raised by the conspiracy theory is whether the relationship between

co-conspirators specified by the conspiracy theory is sufficient to justify the attribution contemplated by the theory. The legal relationship of one party to another may affect the jurisdictional balance; under the attribution method, the legal relationship between two or more persons may be such that it is reasonable to *attribute* the jurisdictional contacts of one party to the other. The effect of attribution is that the contacts that permit jurisdiction over the first party may be used against the second, thereby establishing jurisdiction over that party also. Applied to the conspiracy theory of jurisdiction, the acts of a co-conspirator in furtherance of the conspiracy may be attributed to other co-conspirators if the requirements of the conspiracy theory are met. The attribution principle enables a court to exercise jurisdiction over nonresidents involved in a conspiracy when a co-conspirator performs jurisdictionally sufficient acts in furtherance of the conspiracy.

The use of contact attribution for purposes of establishing personal jurisdiction over nonresident defendants is well-established in the Supreme Court's minimum contacts due process jurisprudence. As discussed, supra, *International Shoe* itself established that attribution of the acts of an agent for personal jurisdiction purposes is consistent with due process. Likewise, courts applying the *International Shoe* standard have held that actions of a partner in the scope of the partnership's business may be attributed to a partnership. *See, e.g., Sher v. Johnson,* 911 F.2d 1357, 1362 (9th Cir.1990) (holding that, because "[f]or purposes of personal jurisdiction, the actions of an agent are attributable to the principal," the acts of a partner are treated as acts of the partnership for purposes of determining whether personal jurisdiction is proper over the partnership if the acts are treated as acts of the partnership under applicable state partnership law). Courts applying *International Shoe* and its progeny have held also that the actions of a subsidiary corporation may be attributed to a parent corporation under some circumstances, even if it would not necessarily be appropriate to pierce the corporate veil between the parent and the subsidiary. *See, e.g., Gallagher v. Mazda Motor of Am., Inc.,* 781 F.Supp. 1079, 1085

(E.D.Pa.1992) (holding that the acts of a subsidiary may be attributed to a parent for jurisdictional purposes if the parent would have done these acts itself if the subsidiary did not exist); *Bulova Watch Co., Inc., v. K. Hattori & Co., Ltd.,* 508 F.Supp. 1322, 1342 (E.D.N.Y.1981) (same).

Finally, in *World–Wide Volkswagen,* the Supreme Court addressed the issue of when the actions of distributors of a manufacturer's goods may be attributed to a manufacturer for jurisdictional purposes. In *World–Wide Volkswagen,* the defendant, World–Wide, was a regional distributor of Volkswagen automobiles, selling to dealerships in New York, New Jersey, and Connecticut that then sold the cars to residents of those states. *World–Wide Volkswagen,* 444 U.S. at 298, 100 S.Ct. at 567. Given that its products were not distributed to retailers who sold into Oklahoma, the forum at issue, World–Wide did not place its cars into the stream of commerce with the expectation that they would be purchased by Oklahoma consumers. *Id.* at 297–98, 100 S.Ct. at 567. Consequently, the Court concluded that World–Wide could not have reasonably anticipated facing a suit in Oklahoma based upon allegations that these automobiles were defective. *Id.* at 296–97, 100 S.Ct. at 566–67 (rejecting this view because under it "[e]very seller of chattels would in effect appoint the chattel his agent for service of process"). The *World–Wide Volkswagen* Court, however, held that a manufacturer could be subject to jurisdiction in a forum state if it "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* at 298, 100 S.Ct. at 567. Thus, the Court effectively held that the acts distributors take in distributing a manufacturer's products into a particular forum state may be attributed to the manufacturer for purposes of obtaining personal jurisdiction over the manufacturer in the state if the manufacturer placed its products into the stream of commerce with the expectation that they would eventually be purchased in the state.

We conclude that the conspiracy theory of jurisdiction does not violate due process. We find that the relationship between co-conspirators contemplated by the conspiracy theory

is similar to the relationship that the Supreme Court deemed sufficient in *World–Wide Volkswagen* to warrant attribution of the acts of a distributor of goods to the manufacturer of the goods. We further conclude that the relationship between co-conspirators contemplated by the conspiracy theory is different than the relationships that the Supreme Court has found insufficient for attribution.

In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), Justice Brennan provided a helpful synthesis of the Supreme Court's due process personal jurisdiction jurisprudence. Justice Brennan explained that a central purpose behind the due process minimum contacts requirement of *International Shoe* is to ensure that "individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.' " *Id.* at 471–72, 105 S.Ct. at 2181–82 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring)). This "fair warning" requirement serves the further purpose of ensuring that potential defendants can with reasonable certainty predict the fora in which they may be forced to defend suits if they engage in certain types of conduct. *See id.* at 472, 105 S.Ct. at 2182. This in turn permits " 'potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " *Id.* (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567).

It was this due process concern that, without fair warning that a potential defendant may be subject to suit in a particular forum, the potential defendant would be unable to plan its activities so as to take into account the possibility of defending a suit in that forum that led the *World–Wide Volkswagen* Court to delineate the scope of the stream of commerce theory as it did. In *Burger King,* Justice Brennan explained that the fair warning requirement is satisfied if a defendant purposefully directs activities at the forum state and litigation arises out of those activities. *See id.* at 472–73, 105 S.Ct. at 2182. He then applied that principle to the Court's holding in

*World–Wide Volkswagen,* noting that the fair warning requirement explains the Court's conclusion in *World–Wide Volkswagen* that a manufacturer must expect that its products will be distributed in a particular forum when it places them in the stream of commerce in order to be subject to suits related to those products in that forum. *See id.* As the *World–Wide Volkswagen* Court noted, World–Wide's lack of fair warning that it may face suit in Oklahoma by selling cars to dealerships in the Northeast left it unable to "act to alleviate the risk of . . . litigation by procuring insurance, passing the expected costs on to customers, or . . . severing its connection with the State." *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567.

The relationship between co-conspirators required by the conspiracy theory ensures that a co-conspirator subjected to the personal jurisdiction of a forum state under the theory has fair warning that he or she could be subjected to suit in the forum state sufficient to satisfy the due process concerns about fair warning of the possibility of suit that motivated the *World–Wide Volkswagen* Court. According to the conspiracy theory, a co-conspirator can be subjected to the personal jurisdiction of a particular forum only if the co-conspirator had a reasonable expectation, at the time the co-conspirator agreed to participate in the conspiracy, that acts to be done in furtherance of the conspiracy by another co-conspirator would be sufficient to subject that other co-conspirator to personal jurisdiction in the forum. Civil co-conspirators can be held liable for the acts of other co-conspirators done in furtherance of their conspiracy. *See Hoffman v. Stamper,* 385 Md. 1, 24–25, 867 A.2d 276, 290 (2005). Thus, a co-conspirator who agrees to participate in a conspiracy that the co-conspirator reasonably anticipated or could be said to have reasonably anticipated at the time of agreeing to enter it will result in acts done in furtherance of the conspiracy sufficient to subject another co-conspirator to the personal jurisdiction of a particular forum can also reasonably anticipate being subject to suit in that forum by entering into the conspiracy.

It is important to note that under the conspiracy theory, acts of one co-conspirator done in the course of the conspiracy that subject that co-conspirator to personal jurisdiction in a particular forum are attributed to another co-conspirator only if the other co-conspirator reasonably expects *at the time the other conspirator agreed to participate in the conspiracy* that such acts will be done and that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state. This requirement, that the reasonable expectation be present at the time the co-conspirator agrees to the conspiracy, satisfies the *World–Wide Volkswagen* requirement that personal jurisdiction is proper over a person in a particular forum. If a person contemplating entering into a conspiracy wishes to avoid being subject to the personal jurisdiction of a particular forum based on the forum-related actions of another co-conspirator, that person can simply refrain from entering into the conspiracy, or can agree to enter into the conspiracy only if it is modified so that it does not contemplate actions directed at the forum the person wishes to avoid.

Because the conspiracy theory gives one subject to personal jurisdiction in a forum the ability to avoid in advance being subject to suit in the forum, it satisfies the fundamental due process requirement that a defendant can be involuntarily subjected to the personal jurisdiction of a forum only if the defendant "purposefully avails itself of the privilege of conducting activities in the forum state." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958); *see Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183 ("the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' with the forum state"). *World–Wide Volkswagen* recognized that if a defendant's activities are such that the defendant can reasonably anticipate being subject to suit in a forum by virtue of his or her intentional acts, the defendant has purposefully availed itself of privilege of conducting activities within the forum:

"When a corporation 'purposefully avails itself of the privilege of conducting activities within the forum State,' it has clear notice that it is subject to suit there, and can act to

alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."

*World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567 (citations omitted). The conspiracy theory satisfies the *World–Wide Volkswagen* fair warning requirement, and therefore, it also satisfies the purposeful availment requirement as well.

Our conclusion that the conspiracy theory is consistent with due process is reinforced by comparison of the relation between co-conspirators required under the theory with the situations in which the Court has held that a relation between two parties is insufficient to warrant attribution of the acts of one party to the other for purposes of obtaining personal jurisdiction over the other party. The Supreme Court has held consistently that a person cannot be subject to personal jurisdiction in a particular forum based on the unilateral forum-related activities of a third party. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416–17, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404 (1984) (holding that acceptance of a check from a third party drawn on a bank located in the forum state cannot be considered in determining whether the acceptor of the check can be subjected to the personal jurisdiction of the forum state because it is the "unilateral activity of a … third person"); *Kulko v. Super. Ct.,* 436 U.S. 84, 93–94, 98 S.Ct. 1690, 1697–98, 56 L.Ed.2d 132 (1978) (holding that a forum state could not obtain personal jurisdiction over a parent in a custody action simply because the parent agreed to a visitation arrangement with the other parent and the other parent took the child to the forum state

and initiated suit, as this would "arbitrarily subject one parent to suit in any State of the Union where the other parent chose to spend time while having custody of their offspring pursuant to a separation agreement"); *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239–40 (holding that Florida courts could not obtain personal jurisdiction over Delaware trust simply because powers of appointment under trust were executed in Florida because "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State").

Unlike the situations in *Helicopteros, Kulko,* and *Hanson,* basing personal jurisdiction on the actions of a co-conspirator according to the requirements of the conspiracy theory does not result in personal jurisdiction based on the unilateral forum-related actions of a third party. By the terms of the conspiracy theory, a co-conspirator to whom the acts of another co-conspirator are attributed must have agreed to participate in a conspiracy that he or she could reasonably have expected at the time of agreement to involve the forum-related actions attributed to him or her. The acts attributed are not simply unilateral acts of the co-conspirator who literally performed them, but are also the acts of the other co-conspirator.

The Supreme Court has stated also that an exercise of personal jurisdiction is inconsistent with due process if a defendant is "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *See Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183 (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) ("random" and "fortuitous"), and *World–Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. at 568 ("attenuated")). An exercise of personal jurisdiction over a co-conspirator based on the relationship between co-conspirators required under the conspiracy theory is not random, fortuitous, or attenuated. It is neither random nor fortuitous because it is based on the co-conspirator's deliberate choice to enter into the conspiracy. Nor is it too "attenuated," as the co-conspirator must reasonably expect at the time of entering into the conspiracy that acts in furtherance of the conspiracy

upon which jurisdiction is based will be directed against the forum state. *Compare World–Wide Volkswagen,* 444 U.S. at 299, 100 S.Ct. at 568 (holding that revenues World–Wide may have derived from the fact that automobiles they sold to dealers who then sold to customers in New York, New Jersey, and Connecticut were able to be used in Oklahoma was "far too attenuated a contact to justify [Oklahoma's] exercise of *in personam* jurisdiction").

Our conclusion that the conspiracy theory is consistent with due process is also reinforced by the fact that many courts that have considered the issue have reached the same conclusion as we do today.[4] Five state supreme courts, four state

---

4. Despite this wide agreement among courts that the conspiracy theory of personal jurisdiction is consistent with due process, a minority of courts have taken a contrary view. One such argument is based on *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953). *See, e.g., In re New Motor Vehicles Canadian Exp.,* 307 F.Supp.2d 145, 158 (D.Me.2004) (rejecting conspiracy theory on basis of *Bankers Life* ). In *Bankers Life,* the Court noted in dicta that the petitioner's conspiracy theory of venue under 15 U.S.C. § 15, a federal antitrust venue statute, "has all the earmarks of a frivolous albeit ingenious attempt to expand the statute." *Id.* at 384, 74 S.Ct. at 149. Some courts and commentators have seized upon these dicta in *Bankers Life* to conclude that the conspiracy theory is inconsistent with due process. This reliance, however, is misplaced, as the Court's dicta were not premised on the Due Process Clause, but rather on its view that Congress would have been more explicit in the text of 15 U.S.C. § 15 if it intended to permit conspiracy as a basis for venue in private civil antitrust actions. *Bankers Life,* 346 U.S. at 384, 74 S.Ct. at 148–49.

One other argument against the conspiracy theory that has appealed to some courts is the argument that the conspiracy theory is inconsistent with the Supreme Court's admonition in *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980), that "[t]he requirements of *International Shoe* ... must be met as to each defendant over whom a state court exercises jurisdiction." *See, e.g., Gibson,* 897 S.W.2d at 773 (rejecting conspiracy theory because *Rush* "makes clear ... [that] it is the contacts of the defendant himself that are determinative" quoting *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 437–38 (Tex.1982)). This argument rests on a misreading of *Rush.* The statement quoted from *Rush* does not stand for the proposition that all attribution for purposes of obtaining personal jurisdiction is inconsistent with due process, as the Court made perfectly clear by stating in the sentence preceding it that "[n]aturally, the parties' relationships with each other may be significant in evaluating

intermediate appellate courts, and numerous federal courts have recognized the conspiracy theory. The Minnesota Supreme Court, in *Hunt v. Nevada State Bank*, 285 Minn. 77, 172 N.W.2d 292 (1969), held that the conspiracy theory was permitted both under Minnesota's long-arm statute and consistent with due process. Considering the due process issue, the court concluded that assertion of personal jurisdiction over out-of-state co-conspirators under the conspiracy theory "does not offend our notions of fundamental fairness." *Hunt*, 172 N.W.2d at 312. The court's holding was based in part on the asymmetry that would result if co-conspirators are permitted to enjoy the benefits and protections of the law of a forum, but are not subject to the personal jurisdiction of that forum:

> "With respect to any of the [co-conspirator] defendants, to suggest that it is unfair to require them to respond to an action in this jurisdiction would seem to say that they may rely on our contract law to uphold the terms of lawful agreements but that they may not be required to defend an action based on injury to our citizens as a result of an unlawful agreement."

*Id.*

Judge Posner, in *Stauffacher v. Bennett*, 969 F.2d 455 (7th Cir.1992), echoed this rationale. Finding it difficult to understand why personal jurisdiction should be exempted from the general rule that the acts of co-conspirators are attributed to one another, he concluded that "[i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Id.* at 459. Because the plaintiffs in *Stauffacher* failed to allege that the defendant at issue was a member of the conspiracy, the court

---

their ties to the forum." *Rush*, 444 U.S. at 332, 100 S.Ct. at 579. Consistent with this statement, the *Rush* court did not reject contact attribution per se, but simply rejected the holding of the lower court that the contacts of one defendant could be attributed to another defendant simply by virtue of the fact that they were defending parties in the same action. *Id.* at 331–32, 100 S.Ct. at 579.

did not need to decide whether the conspiracy theory was consistent with due process. *Id.* at 460.

The Delaware Supreme Court, in holding that the conspiracy theory is consistent with due process, emphasized that the awareness of actions in furtherance of the conspiracy directed at the forum state that a co-conspirator must have when that person agrees to participate in the conspiracy permits the conclusion that the act of agreeing to the conspiracy is an act of purposeful availment:

> "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws."

*Istituto Bancario,* 449 A.2d at 225 (citations omitted); *see also Santa Fe Technologies,* 42 P.3d at 1234 (following *Istituto Bancario* ).

### B. The Maryland Long–Arm Statute and the Conspiracy Theory

We have long recognized that the General Assembly, in enacting the long-arm statute, intended "to expand the boundaries of permissible in personam jurisdiction to the limits permitted by the Federal Constitution." *Geelhoed,* 277 Md. at 224, 352 A.2d at 821; *see* § 6–101(b) ("It is the intention of the General Assembly to extend the personal jurisdiction ... of the courts of the state ... to the fullest extent permitted by the Constitution and laws of the United States.").[5] Conse-

---

5. Our long-standing approach to the interpretation of the Maryland long-arm statute that the reach of the statute is as far as due process permits is consistent with the approach taken by most jurisdictions. Some jurisdictions have legislatively adopted expansive approaches to their long-arm statutes. *See, e.g.,* Tenn.Code Ann. § 20–2–214(a)(6) (1994) (permitting exercise of personal jurisdiction over nonresident defendant on "[a]ny basis not inconsistent with" the state or federal Constitution). Other jurisdictions have adopted expansive interpretations of their long-arm statutes by judicial decision. *See, e.g., Automatic Sprinkler Corp. of Am. v. Seneca Foods Corp.,* 361 Mass. 441, 280 N.E.2d 423, 424 (1972) (holding that the Massachusetts long arm statute

quently, we interpret the long-arm statute in light of this intention, "rendering where possible an interpretation consistent with" the requirements imposed by the Due Process Clause. *See, e.g., Geelhoed,* 277 Md. at 224, 352 A.2d at 821.[6] Applying this principle of statutory construction, we hold that a co-conspirator is an "agent" within the meaning of § 6–103(b) when the requirements of the conspiracy theory are met.

 The issue before us is one of statutory interpretation, and we therefore apply well-settled principles of statutory construction. The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the Legislature. *Kushell v. DNR,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005). If the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written. *Collins v. State,* 383 Md. 684, 689, 861 A.2d 727, 730 (2004). If, however, the statutory text reveals ambiguity, "then the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal." *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003). When we do find such an ambiguity, we look at the meaning of the statutory language at issue "in light of the objectives and purposes of the [legislative] enactment." *Id.* at 388, 835 A.2d at 1226.

---

permits "an assertion of jurisdiction over [a nonresident defendant] to the limits allowed by the Constitution of the United States.").

**6.** We stated recently in *Beyond v. Realtime,* 388 Md. 1, 15, 878 A.2d 567, 576 (2005) that "[w]e have consistently held that the purview of the long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the Federal Constitution." We did not, of course, mean by this that it is now permissible to simply dispense with analysis under the long-arm statute. *See id.* at 14, 878 A.2d at 575 (noting that personal jurisdiction analysis entails "dual considerations," the first of which is analysis under the long-arm statute). Rather, we meant no more than what we said in *Geelhoed, viz.,* that we interpret the long-arm statute to the limits permitted by the Due Process Clause when we can do so consistently with the canons of statutory construction. *See id.* at 15, 878 A.2d at 577 (citing *Geelhoed* in support of above-quoted language).

As a matter of substantive law, a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators. With respect to criminal conspiracies, Maryland has long recognized the common-law rule that the existence of a conspiracy creates an agency relationship between the co-conspirators, and that this relationship serves as the basis for holding one co-conspirator liable for some criminal acts of other co-conspirators.

In *Campbell v. State*, 293 Md. 438, 443, 444 A.2d 1034, 1037 (1982), we examined criminal co-conspirator liability in the context of reaffirming the common law "agency" theory of felony murder. We reaffirmed the common-law approach to determining the scope of the felony-murder rule, and rejected a broad application of the proximate cause theory of felony-murder taken by some jurisdictions. *See id.* at 450–52, 444 A.2d at 1041–42.[7] In the course of explaining our common-law "agency" approach to felony-murder, we relied on the "classic statement of the agency theory" given by the court in *Commonwealth v. Campbell*, 89 Mass. 541 (1863), quoting from the court's opinion as follows:

" 'There can be no doubt of the general rule of law, that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow from it, and that, if he combines and confederates with others to accomplish an illegal purpose, he is liable *criminaliter* for the acts of each and all who participate with him in the execution of the unlawful design. *As they all act in concert for a common object, each is the agent of all the others, and the acts done are therefore the acts of each and all.*

\* \* \* \* \* \*

*No person can be held guilty of homicide unless the act is either actually or constructively his, and it cannot be his*

---

7. In *Campbell*, we stated that "the proximate cause theory ordinarily should not be employed to extend the applicability of the felony murder doctrine." *Id.* at 451, 444 A.2d at 1041. We did, however, endorse its application in "shield" cases. *See id.* at 451 n. 3, 444 A.2d at 1041 n. 3.

*act in either sense unless committed by his own hand or by
some one acting in concert with him or in furtherance of a
common object or purpose.'* "

*Campbell,* 293 Md. at 443–44, 444 A.2d at 1038 (quoting
*Campbell,* 89 Mass. at 543–44 (emphasis added)). In *Campbell,* we recognized that the existence of a criminal conspiracy
creates an agency relationship between the participants in the
conspiracy, and we further recognized that this agency relationship establishes the scope of the extent to which the
actions of one co-conspirator can be attributed to another for
purposes of the felony-murder rule. *See also Watkins v.
State,* 357 Md. 258, 269–73, 744 A.2d 1, 6–9 (2000) (discussing
agency theory); *State v. Stouffer,* 352 Md. 97, 116, 721 A.2d
207, 216 (1998) (same).

Maryland law has also long recognized civil conspiracy as a basis for tort liability. As far back as *Kimball v.
Harman,* 34 Md. 407 (1871), it was well-established that co-conspirators could be subjected to civil tort liability based on
acts taken in furtherance of the conspiracy by members of the
conspiracy. In *Harman,* we stated as follows:

"There is no doubt of the right of a plaintiff to maintain an
action on the case against several, for conspiring to do, and
actually doing, some unlawful act to his damage. But it is
equally well-established, that no such action can be maintained unless the plaintiff can show that he has in fact been
aggrieved, or has sustained actual legal damage by some
overt act, done in pursuance and execution of the conspiracy."

*Harman,* 34 Md. at 409. We have held consistently that civil
conspiracy "is not a separate tort capable of independently
sustaining an award of damages in the absence of other
tortious injury to the plaintiff." *Hoffman,* 385 Md. at 25, 867
A.2d at 290 (internal citations and quotations omitted). Thus,
" '[n]o action in tort lies for conspiracy to do something unless
the acts actually done, if done by one person, would constitute
a tort.' " *Alleco v. Harry & Jeanette Weinberg Foundation,*
340 Md. 176, 190, 665 A.2d 1038, 1045 (1995) (quoting *Dom-*

*chick v. Greenbelt Consumer Services,* 200 Md. 36, 42, 87 A.2d 831, 834 (1952)). Nonetheless, where the acts done in furtherance of the conspiracy by the members of the conspiracy constitute a separate tort, these acts are attributed to other members of the conspiracy for purposes of establishing civil tort liability over them. In this respect, civil conspiracy is similar to criminal conspiracy: both with civil conspiracy and with criminal conspiracy, the acts of one co-conspirator in furtherance of the conspiracy are regarded as acts of other co-conspirators for purposes of establishing liability (civil or criminal, as the case may be) over the other co-conspirator. Thus, we have recognized that civil co-conspirators, like criminal co-conspirators, act as agents of one other when engaging in acts in furtherance of their conspiracy. In *Western Maryland Dairy v. Chenowith,* 180 Md. 236, 23 A.2d 660 (1942), we stated as follows:

> "A fraudulent conspiracy, sufficient to serve as the basis for an action in a civil case, is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim. *Rent–A–Car Co. v. Globe & Rutgers Fire Insurance Co., 161 Md. 249, 260, 156 A. 847.* When individuals associate themselves together in an unlawful enterprise, any act done by one of the conspirators is in legal contemplation the act of all. *The mind of each being intent upon a common object, and the energy of each being enlisted in a common purpose, each is the agent of all the others, and the acts done and words spoken during the existence of the enterprise are consequently the acts and words of all.*"

*Id.* at 243, 23 A.2d at 664 (emphasis added).

■ Despite the long-standing characterization of co-conspirators as "agents" of one another under Maryland law, appellants argue that the conspiracy theory of personal jurisdiction is inconsistent with the text of the long-arm statute because the substantive law of agency requires for the creation of an agency relationship that the principal has the right to control the agent. *See, e.g., Beyond,* 388 Md. at 27, 878

A.2d at 583. We are not persuaded. As noted above, we have long recognized that the intent of the General Assembly in enacting § 6–103(b) was to permit all exercises of personal jurisdiction that are consistent with due process. Therefore, given our conclusion above that the conspiracy theory of jurisdiction is consistent with due process, and the support in Maryland law for the proposition that co-conspirators act as agents of one another when they act in furtherance of a conspiracy, we conclude that the General Assembly intended a broad construction of the term "agent" and did not intend to require a showing that one exercises control over the other. We hold that when the requirements of the conspiracy theory are met, one co-conspirator may be the "agent" of another co-conspirator within the meaning of § 6–103(b).

### IV.

We now turn to the second question certified to this Court—the requisite elements a plaintiff must allege for a court to have jurisdiction over the out-of-state defendant under that theory. Appellants urge us to adopt the following additional elements: (1) one co-conspirator committed an act in Maryland that had an effect on the plaintiff in Maryland, and the defendant co-conspirator had actual prior knowledge that the co-conspirator would commit this act in Maryland; (2) the co-conspirator who committed this act was acting at the direction of the defendant co-conspirator in the context of a relationship "tantamount to actual agency;" and (3) the conspiracy was intended at least in part to benefit the defendant co-conspirator individually. We consider and reject each of these in turn.

As for the first proposed element, the Supreme Court's opinion in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), makes clear that it is not always necessary for a defendant to commit an act in a forum state in order for that state to exercise personal jurisdiction over the defendant consistently with due process. In *Calder*, the plaintiff below, Jones, a California resident, alleged that the defendants libeled her by writing, editing, and publishing in Florida an

article about her. *Id.* at 784, 104 S.Ct. at 1484. Although the defendants never personally performed any actions in California in connection with the article about Jones,[8] the Court nonetheless held that personal jurisdiction over the defendants in California was consistent with due process. *Id.* at 785–89, 104 S.Ct. at 1485–87. The Court concluded that personal jurisdiction in California was proper because the defendants created and distributed an article that they knew would be widely circulated in California and would cause injury to a California resident, and therefore could " 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article." *Id.* at 789–90, 104 S.Ct. at 1487 (quoting *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567).

We do not adopt the second proposed element because adopting it would itself be "tantamount" to a rejection of the conspiracy theory of personal jurisdiction. As explained above in our discussion of the conspiracy theory and due process, the requirement of single or multi-directional control is not necessary for contact attribution to be consistent with due process.

Finally, we see no reason to require that the conspiracy be intended to individually benefit a defendant co-conspirator. Appellants argue that this requirement is necessary to ensure that the out-of-state co-conspirator is purposefully directing activities at Maryland. In support of this position, appellants cite two Second Circuit cases, *Green v. McCall,* 710 F.2d 29 (2d Cir.1983), and *Grove Press, Inc. v. Angleton,* 649 F.2d 121 (2d Cir.1981). Neither of these cases, however, supports appellants' position.

In *Grove Press,* the plaintiffs, Grove Press and two of its officers, filed suit against several CIA employees in the Southern District of New York. *Id.* at 122. Although the CIA

---

8. The trial court did find that one of the defendants took a trip to California in connection with the article, but the *Calder* Court made clear that it did not base its holding on this finding. *See id.* at 785 n. 4, 104 S.Ct. at 1485 n. 4.

employee defendants "had not personally committed any tortious acts in New York," the District Court held that personal jurisdiction over them was proper in New York because they had done so through New York-based CIA officials acting in New York, whom the District Court found were co-conspirators of the defendants. *Id.* at 122–23. The *Grove Press* court reversed, holding that there was an insufficient factual basis in the record to support the District Court's finding of a conspiracy:

> "Plaintiffs have made no showing whatever that any of the unnamed CIA employees who allegedly performed the in-State tortious acts necessary for jurisdiction under [the New York long-arm statute] were parties to the 'common agreement.' So far as the record discloses, these individuals, whoever they were, were simply United States employees acting as agents for the United States government."

*Id.* at 123. Similarly, the *Green* court held that an assertion of personal jurisdiction over government officers in their individual capacities was not permitted under a similar provision of the Connecticut long-arm statute because the in-State government actors were simply acting in their official capacities, and not as the agents of the defendant government officers in their individual capacities. *See Green,* 710 F.2d at 33–34.

Neither *Grove Press* nor *Green* held that due process invariably requires a showing of intended "individual benefit" on the part of a co-conspirator in order to exercise personal jurisdiction over that co-conspirator under the conspiracy theory. Rather, they held, unremarkably, that there must be a conspiracy, and that the persons who undertook the forum-directed activities that are to serve as the basis for exercising personal jurisdiction over the other co-conspirators must have been part of the conspiracy.[9] These requirements are incorpo-

---

9. At best, *Grove Press* supports the position that evidence that a putative co-conspirator stands to benefit individually from a proposed common course of action is relevant to the issue of whether that putative co-conspirator is actually part of the conspiracy in question. *See Grove Press,* 649 F.2d at 122-23 (noting in support of its holding that the District Court "found nothing to suggest that [the defendants] expected

rated in the *Cawley* elements. *See Cawley*, 544 F.Supp. at 135. Consequently, we find no support for appellants' third proposed element in *Grove Press* or *Green*, and hence are unpersuaded by appellants' argument that we should adopt this element.

*CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.*

___

to benefit as individuals from the wrongdoing alleged in the complaint").