*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2019 UT 44**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

RASER TECHNOLOGIES, INC., by and through
HOUSTON PHOENIX GROUP, LLC as its Attorney in Fact,[1]
*Appellants,*

*v.*

MORGAN STANLEY & COMPANY, LLC,[2]
*Appellees.*

No. 20170325
Filed August 13, 2019

On Direct Appeal

Third District, Salt Lake
The Honorable Judge Todd M. Shaughnessy
No. 150906718

Attorneys:

Karra J. Porter, Kristen C. Kiburtz, Paul T. Moxley,
Patrick E. Johnson, Salt Lake City, Alan M. Pollack, New York, NY,
James W. Christian, Houston, TX, for appellants

---

[1] Other Appellants in this case are: KELLY TRIMBLE; MARK SANSOM; OCEAN FUND, LLC; WARNER INVESTMENTS, LLC; and MAASAI, INC.

[2] Other Appellees in this case are: GOLDMAN SACHS & CO., LP; GOLDMAN SACHS EXECUTION AND CLEARING L.P.; GOLDMAN SACHS INTERNATIONAL; MERRILL LYNCH, PIERCE, FENNER & SMITH INC.; MERRILL LYNCH PROFESSIONAL CLEARING CORP.; MERRILL LYNCH INTERNATIONAL; and UBS SECURITIES LLC. Raser Technologies, Inc. stipulated to a voluntary dismissal of the appeal as to Appellee Morgan Stanley & Co. LLC (MSCO) with prejudice.

James S. Jardine, Mark W. Pugsley, Robert P. Harrington, Salt Lake City, for appellees

Richard C. Pepperman II, John G. McCarthy, New York, NY, *pro hac vice*, for appellees Goldman Sachs & Co., LP; Goldman Sachs Execution and Clearing L.P.; Goldman Sachs International

Andrew J. Frackman, Abby F. Rudzin, Brad M. Elias, New York, NY, *pro hac vice*, for appellees Merrill Lynch, Pierce, Fenner & Smith Inc.; Merrill Lynch Professional Clearing Corp.; Merrill Lynch International

---

JUSTICE PEARCE authored the opinion of the Court in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

---

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶ 1  Raser Technologies, Inc., Kelly Trimble, Mark Sansom, Ocean Fund, LLC (Ocean Fund), Warner Investments, LLC, and Maasai, Inc. (collectively Plaintiffs) allege a complex conspiracy among Merrill Lynch, Pierce, Fenner & Smith (Merrill), Merrill Lynch Professional Clearing Corporation (Merrill Clearing), Merrill Lynch International (Merrill International), Goldman Sachs & Co., (Goldman), Goldman Sachs Execution and Clearing (Goldman Clearing), and Goldman Sachs International (Goldman International) (collectively Defendants).[3]

¶ 2  Plaintiffs allege that Defendants "devised and perpetrated a naked short selling stock manipulation scheme that targeted and intentionally destroyed a Utah company, Raser Technologies." The merits of this theory are not before us. Instead, we are faced with the threshold determination of whether a Utah court may assert specific personal jurisdiction over some or all of Defendants.

¶ 3 Raser was a geothermal energy company incorporated in Delaware and headquartered in Utah. Raser maintained an investment banking relationship with Merrill. In 2008, Merrill

---

[3] This opinion will sometimes refer to the parties collectively for ease of reference. When relevant to the analysis, this opinion will refer to the parties individually.

structured several transactions on behalf of Raser in a stated effort to raise capital for the company. Around this time, Merrill and Goldman sold Raser's stock short. Some of these sales may have constituted a related, but separate, practice known as naked short selling.

¶ 4 Several years after the short sales occurred, Raser filed for bankruptcy. Plaintiffs subsequently sued Merrill, Goldman, and several related entities, for violations of the Utah Pattern of Unlawful Activity Act.[4] Plaintiffs alleged that communications and securities fraud formed the pattern's skeleton of unlawful activity.

¶ 5 Defendants moved to dismiss Plaintiffs' complaint for lack of personal jurisdiction. In response, Plaintiffs argued that the court could assert specific jurisdiction over Defendants because of the contacts each defendant developed with Raser. Plaintiffs also argued that even if each individual defendant did not establish minimum contacts with the State of Utah, the district court could exercise personal jurisdiction because Defendants had engaged in a conspiracy to manipulate Raser's stock price, the effects of which were felt by Utah residents. Plaintiffs alternatively argued that so long as one defendant established minimum contacts with the state, those contacts could be imputed to the other defendants under the conspiracy theory of jurisdiction. The district court disagreed with each contention and dismissed Plaintiffs' complaint for want of personal jurisdiction.

¶ 6 The district court analyzed Plaintiffs's claims against Defendants collectively, without analyzing the nature of each individual defendant's contacts as they relate to each individual plaintiff's claims. Recent United States Supreme Court jurisprudence clarifies that courts must analyze each plaintiff's claims and the relation of those claims to the forum state, in addition to analyzing a defendant's contacts to the forum state. Because the district court analyzed Plaintiffs' claims and Defendants' contacts collectively, it may have distorted its analysis.

¶ 7 After analyzing recent United States Supreme Court jurisprudence, we conclude that there is an articulation of the conspiracy theory of jurisdiction that comports with the due process principles of the Fourteenth Amendment. And we hold that the Utah

---

[4] Raser Technologies, Inc., did not sue Merrill. Therefore, Merrill is only a defendant as to plaintiffs Kelly Trimble, Mark Sansom, Ocean Fund, Warner Investments, and Maasai.

Nonresident Jurisdiction Act compels us to adopt the conspiracy theory of jurisdiction.

¶ 8 We vacate and remand for the district court to reexamine the claims and contacts, and apply the jurisdictional tests we announce here.

## BACKGROUND

### I. Short Selling

¶ 9 A brief overview of the trading practice known as short selling helps understand Plaintiffs' allegations.[5] Short selling is best characterized as a "sell high, buy low" strategy. Alexis Brown Stokes, *In Pursuit of the Naked Short*, 5 N.Y.U. J. L. & BUS. 1, 3 (2009). If everything goes according to plan, an investor, suspecting that the price of a stock will decrease, borrows the stock, sells it, waits for the price to decline, purchases the stock at the lower price, returns the stock to the lender, and "pockets the difference in price as profit." *Id.* Typically, the investor will borrow the stock from a brokerage firm, and the borrowed stock originates from the firm's own inventory, the margin account of other brokerage firm clients, or another lender. U.S. SEC. & EXCH. COMM'N, KEY POINTS ABOUT REGULATION SHO, https://www.sec.gov/investor/pubs/regsho.htm (last visited August 7, 2019). Short selling is a lawful trading practice in many instances. *Id.* But short selling is illegal when used to manipulate the price of a stock. *Id.*

¶ 10 In a typical transaction, the seller has a three-day settlement period to deliver the stock to the buyer. U.S. SEC. & EXCH. COMM'N, NAKED SHORT SALES, https://www.sec.gov/answers/ nakedshortsale.htm (last visited August 7, 2019). In a naked short sale, the investor identifies a stock that she suspects is overvalued and likely to decrease in price, then sells shares of the stock that she does not own or has not borrowed and does not intend to own or borrow, thus creating phantom shares of the stock. *Id.*; Stokes, *supra* ¶ 9 at 6. Because the seller does not own or possess the shares she sold, she cannot deliver the securities within the settlement period. U.S. SEC. & EXCH. COMM'N, KEY POINTS ABOUT REGULATION SHO, https://www.sec.gov/investor/pubs/regsho.htm (last visited

---

[5] "Because this is an appeal from a grant of a motion to dismiss, we construe the facts in the light most favorable to . . . the non-moving parties." *Bylsma v. R.C. Willey*, 2017 UT 85, ¶ 4 n.2, 416 P.3d 595.

August 7, 2019). This is known as a "failure to deliver" or "fail"—the securities equivalent of an "IOU." Stokes, *supra* ¶ 9 at 7; U.S. SEC. & EXCH. COMM'N, KEY POINTS ABOUT REGULATION SHO, https://www.sec.gov/investor/pubs/regsho.htm (last visited August 7, 2019).

¶ 11 The Depository Trust and Clearing Corporation (DTCC) records the fails. The DTCC is "a financial services company that clears and settles securities trades and provides custody of securities." Stokes, *supra* ¶ 9 at 6. The DTCC eliminates the need for exchanging paper stock certificates and provides an efficient and safe trading mechanism for buyers and sellers. *Id.*

¶ 12 This system allows a transaction to occur, and all monies to be paid, before delivery of the stock occurs. *Id.* Broker-dealers and banks credit the shares to the buyer before delivery. *Id.* at 7. If the seller does not deliver the shares, a fail occurs, but the buyer still possesses the purchased shares. *Id.* This can result in an artificial oversupply of the stock. *Id.* When the market is flooded with the chimerical shares, the stock price usually falls. *Id.* The SEC heavily regulates naked short selling, and its legality is confined to limited circumstances. U.S. SEC. & EXCH. COMM'N, KEY POINTS ABOUT REGULATION SHO, https://www.sec.gov/investor/pubs/regsho.htm (last visited August 7, 2019). Plaintiffs allege that Defendants' trading practices ventured outside of these limited circumstances and into the realm of illegal activity.

## II. Raser

¶ 13 Raser was a geothermal energy company incorporated in Delaware with its principal place of business in Salt Lake City, Utah. Raser planned to develop a new geothermal plant in Beaver County, Utah. Over 250 Raser shareholders resided in Utah, including plaintiffs Kelly Trimble and Mark Sansom.

¶ 14 Raser needed to raise capital to fund its ongoing operations and construction projects. In 2007, Raser entered into negotiations with "upper management" at Merrill to structure a series of transactions designed to raise capital. Raser's CEO, Kraig Higginson, participated in the negotiations on behalf of the company. The negotiations involved "in excess of a dozen conferences," both in Utah and telephonically with individuals in Utah, and the exchange of multiple documents to and from the parties in Utah. At the conclusion of the negotiations, Merrill proposed a $55 million Convertible Bond Offering (CBO).

*The Transaction*

¶ 15  For the CBO, Merrill suggested that Higginson contact two of Raser's shareholders, Ned Warner[6] and Ty Mattingly, to release approximately three million unrestricted shares of Raser stock. Higginson explained that, at Merrill's suggestion, the shares were to be used as "hedges" in the bond offering. After the discussion with Higginson, Warner spoke with one of Merrill's managing directors regarding his unrestricted shares.

¶ 16  In his telephone conversation with Merrill, Warner "expressed . . . [his] willingness to open an account with [Merrill] and deposit [his] 2,000,000 unrestricted shares of Raser stock." However, Warner "clearly indicated . . . that [he] only would be willing to have [his] shares used by participants in the CBO, and that under no circumstances did [he] want [his] shares used by any other party who wanted to short Raser's stock." Merrill assured Warner that the shares would only be used by participants in the CBO. In reliance on this representation, Warner signed and filed the necessary paperwork to open a Merrill account and had his stock certificates delivered to the local Merrill office in Provo, Utah. The CBO occurred in March 2008.

*The Shorts*

¶ 17  Prior to and concurrent with the CBO, Merrill and several other entities shorted Raser stock. Plaintiffs allege that some of the short selling constituted naked short selling, evidenced by the number of fails recorded for various Merrill entities. In 2007, Merrill Clearing was the largest failing broker of Raser. Over the course of 181 days in 2007, Merrill Clearing "consistently held between 75–99% of all Fails of Raser stock." During this time, Merrill Clearing "selectively transferred primarily long positions[7] of its customers to

---

[6] Ned Warner owns and controls plaintiffs Ocean Fund, Maasai, and Warner Investments. These entities collectively owned several million shares of Raser stock.

[7] "In a typical securities transaction, an investor purchases a stock, waits for the stock price to increase, and then sells the stock at a profit. In securities lingo, this 'buy low, sell high' behavior is called 'selling long.'" Stokes, *supra* ¶ 9 at 3. This type of transaction—known as a "long position" limits the risk to the amount invested. U.S. SEC. & EXCH. COMM'N, KEY POINTS ABOUT REGULATION SHO, https://www.sec.gov/investor/pubs/regsho.htm  (last  visited August 7, 2019).

Merrill Lynch while allowing the failed positions . . . to increase." And by "selectively transferring long positions, [Merrill Clearing] increased the number of shares it could lend to short sellers."

*The Trades*

¶ 18   In addition to the short and alleged naked short selling that occurred around the time of the CBO, Merrill, Merrill International, Goldman, and Goldman International moved Raser stock between and among themselves. Around the time of the CBO, Merrill transferred restricted shares of Raser stock to Merrill International. Merrill International then sent the shares back to Merrill as free trading shares.[8]

¶ 19   Approximately ten to fifteen trades occurred between Goldman Clearing, Merrill Clearing, Merrill, and an independent clearing corporation, Newedge LLC. In these transactions, the shares would pass through Newedge before being transferred to either Goldman Clearing, Merrill Clearing, or Merrill. Roughly one million shares moved between companies between January 2008 and August 2008.

¶ 20   Some of the trades took a circuitous path. For example, 450,000 shares moved from Goldman Clearing to Newedge to Merrill Clearing and then to Merrill. Merrill then loaned the shares back to Goldman as part of a loan of 700,000 total shares. These trades formed the basis of Plaintiffs' claims against Defendants.

*The Litigation*

¶ 21    Plaintiffs sued Morgan Stanley & Co, LLC,[9] Merrill, Merrill Clearing, Merrill International, Goldman, Goldman Clearing, and Goldman International.[10] Plaintiffs alleged that Defendants violated the Utah Pattern of Unlawful Activity Act, and as a result, "the value

---

[8] Shares that originate from a broker's account are free trading shares that can be loaned for short selling. Customer shares are restricted and cannot be lent for short selling unless they are placed in a margin account and the customer gives permission to lend them. Once shares are moved to a clearing subsidiary, they are no longer considered customer shares.

[9] Plaintiffs agreed to withdraw all claims and the appeal against Morgan Stanley.

[10] Raser did not pursue claims against Merrill. Raser's co-plaintiffs did.

of Raser stock was diluted, and the company and its shareholders were damaged." Plaintiffs averred that instances of communications fraud and violations of the Utah Uniform Securities Act constituted the predicate acts that formed the pattern of unlawful activity. Plaintiffs also alleged that Defendants' "unlawful conduct occurred within . . . their pervasive and long-standing pattern of naked short selling." Plaintiffs asserted in their complaint that "[p]ersonal jurisdiction [over] Defendants is proper in Utah" because "[e]ach Defendant has continuous and systematic business contacts with Utah."

¶ 22 Defendants moved to dismiss Plaintiffs' claims, arguing that the court lacked personal jurisdiction. Plaintiffs opposed the motion, contending that they had made a prima facie showing of specific jurisdiction. Plaintiffs asserted that they had sufficiently alleged the elements of the effects test as articulated in *ClearOne, Inc. v. Revolabs, Inc.*, 2016 UT 16, 369 P.3d 1269: "Defendants are alleged to have (1) committed intentional acts (stock manipulation and fraud); (2) expressly aimed at Utah (Raser); (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in Utah."

¶ 23 Plaintiffs argued that they satisfied the requirement in *ClearOne* that the "effect in the forum state must be more than an effect on a plaintiff in the forum state" by asserting that "[m]ore than 250 Utah shareholders had millions of dollars in equity destroyed," "[m]ore than 40 Utah residents lost their jobs," "[a]t least 499 Utah creditors lost money from Raser's bankruptcy," and that the State of Utah, dozens of Utah companies, and Beaver County lost millions of dollars. Plaintiffs also argued that the district court could exercise jurisdiction over Defendants with no direct contacts in Utah because, under a conspiracy theory of jurisdiction, "[t]he actions of each member of the conspiracy in furtherance of Defendants' naked short selling scheme [would be] considered in weighing personal jurisdiction."

¶ 24 The district court granted Defendants' motion. The district court first addressed the claims against Merrill. The court noted that Merrill "was an investment banker for Raser, and, in that capacity, had numerous meetings, telephone calls and other contacts with Raser in Utah." Based on that, the court concluded that "if Raser was asserting claims against Merrill . . . that arose out of or related to that investment banking relationship, this court would have personal jurisdiction over Merrill."

¶ 25 The district court continued, "Raser, however is not asserting any claims against Merrill . . . arising from their investment

banking relationship or these contacts; in fact, Raser is not asserting any claim against Merrill . . . at all." And with regards to the other Plaintiffs' claims against Merrill, the court noted that "while it is not disputed that Merrill . . . has offices, employees, and business operations in Utah, plaintiffs do not claim that the court can exercise general personal jurisdiction over it."

¶ 26 The district court noted that Merrill "had stock loan agreements with Raser shareholders, one of which is Plaintiff Ocean Fund, LLC, and plaintiffs contend that [Merrill] breached those agreements by using borrowed Raser shares to support short sales rather than hedging." The court concluded that "[i]f Ocean Fund were asserting a claim for breach of those agreements, or any claim that could fairly be said to arise out of a breach of those agreements, the court would have personal jurisdiction over Merrill . . . to entertain a claim by Ocean Fund." But because Ocean Fund did not plead a breach of contract claim, the district court found that it could not exercise specific personal jurisdiction over Merrill. The court also concluded that Plaintiffs' claim based on the Utah Pattern of Unlawful Activity Act "is considerably more involved and, by necessity, requires participation by other defendants over whom the court cannot exercise personal jurisdiction."

¶ 27 The district court then noted that Plaintiffs sought to impute Merrill's contacts with Utah and Raser to the other Defendants through the conspiracy theory of jurisdiction. The district court refused to recognize the conspiracy theory of jurisdiction, noting that this court previously declined to do so in *Pohl, Inc. of America v. Webelhuth*, 2008 UT 89, 201 P.3d 944. The district court concluded that "[a]s a result, [Merrill's] contacts with Raser and with Utah, standing alone, cannot provide the minimum contacts necessary to establish personal jurisdiction over [Merrill's] co-defendants." And "[b]y the same token, those contacts, standing alone, cannot be relied upon by plaintiffs *other than Raser* to establish specific personal jurisdiction over Merrill."

¶ 28 The district court noted that "[w]ith respect to all of the defendants other than Merrill . . . , and with respect to Merrill . . . and all plaintiffs other than Raser . . . , plaintiffs do not identify any contact between these parties that occurred in Utah." "The closest plaintiffs come to alleging contact by these defendants with Utah is the allegation that the defendants improperly used, relied upon, laundered or otherwise mishandled Raser stock from a public offering 'originating in Utah.'" The court knocked down this assertion because while Raser was headquartered in Utah, Raser was a Delaware corporation and under Delaware statute its stock was

located in Delaware, and that stock traded in New York. Because Plaintiffs did not provide the district court with any authority "suggesting that the location of a company's headquarters determines where stock or a stock offering 'originates,'" the court found this assertion meritless.

¶ 29 The district court noted that "plaintiffs do not allege that any of the wrongful acts by the defendants occurred in Utah," and that "[p]laintiffs instead rely on extraterritorial conduct by the defendants that purportedly was directed at and caused harm here." The court concluded that, "even accepting as true all of plaintiffs' allegations regarding defendants' conduct, and even assuming the defendants knew the harm would be suffered in Utah and would be substantial, plaintiffs have not shown that defendants' conduct was expressly aimed at Utah." "The conduct," the court continued, "was aimed at manipulating the price of Raser's stock, which is legally sited in Delaware and trades in New York. To the extent defendants' conduct could be said to be connected to Utah, that would be true only because Raser chose to locate its headquarters here."

¶ 30 The court ultimately concluded that "aside from having caused harm here, to Raser, its resident shareholders, and perhaps others, plaintiffs have not identified conduct directed at the state. For that reason, the court lacks specific personal jurisdiction over all defendants."

¶ 31 Plaintiffs appealed. After hearing oral argument, we requested supplemental briefing on the effects test and the conspiracy theory of jurisdiction.[11]

---

[11] The supplemental briefing order directed the parties to address the following two questions:

> (1) Should this Court revisit its holding in *ClearOne, Inc. v. Revolabs, Inc.* (2016 UT 16)? Specifically, should this Court revisit the viability of the effects test after *Walden v. Fiore* (134 S.Ct. 1115 (2014))? If so, does the discussion of specific jurisdiction in *Walden* leave room for the effects test's continued viability? Furthermore, how would a post-*Walden* effects test impact the potential exercise of jurisdiction over defendants in this case?
> (2) Is a conspiracy theory of jurisdiction compatible with *Walden* and *Bristol-Myers Squibb Co. v. Superior Court of California* (137 S.Ct. 1773 (2017))? If so, does the

(continued . . .)

**ISSUE AND STANDARD OF REVIEW**

¶ 32 Plaintiffs contend that the district court erred by concluding that the court lacked personal jurisdiction over all Defendants. "In a case such as this one, '[w]here a pretrial jurisdictional decision has been made on documentary evidence only, an appeal from that decision presents only legal questions that are reviewed for correctness.'" *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 8, 201 P.3d 944 (alteration in original) (citation omitted).

**ANALYSIS**

¶ 33 Plaintiffs contend that the district court erred by concluding that it lacked personal jurisdiction over Defendants. First, Plaintiffs argue that the court erred in concluding that Plaintiffs failed to demonstrate that Defendants' conduct was expressly aimed at Utah. Second, Plaintiffs argue that because they pled a conspiracy among Defendants, "the minimum contacts associated with a co-conspirator may be attributed to other co-conspirators when an overt act relevant to the conspiracy is performed in the forum state." And that here, Merrill's contacts in Utah suffice as the overt acts which provide the hook, in Plaintiffs' eyes, to assert jurisdiction over the rest of Defendants. Plaintiffs assert that the conspiracy theory of jurisdiction satisfies the requirements of due process so long as "the co-conspirators to whom minimum contacts are imputed knew or should have known that overt acts would occur in the forum state."

I. General Principles

¶ 34 "The authority of the state to hale a nonresident into a state court hinges on the ability to establish personal jurisdiction." *ClearOne, Inc. v. Revolabs, Inc.*, 2016 UT 16, ¶ 7, 369 P.3d 1269 (citation omitted). And a court's exercise of personal jurisdiction must be "consistent with the due process protections of the Fifth and Fourteen Amendments to the United States Constitution." *Id.* (citation omitted). There are two categories of personal jurisdiction: specific jurisdiction and general jurisdiction. *Id.* "[A] court may assert general jurisdiction over foreign (sister-state or

---

Utah Nonresident Jurisdiction Act (78B-3-201, *et seq.*) require this Court to adopt a test premised on the conspiracy theory of jurisdiction? If the Court is to adopt such a test, what should the elements be and what would the impact of the adoption of such a test be on the potential exercise of specific personal jurisdiction over the defendants in this case?

foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citation omitted) (internal quotation marks omitted). Plaintiffs do not argue that Defendants are subject to general jurisdiction.[12]

¶ 35  "[S]pecific personal jurisdiction gives a court power over a defendant only with respect to claims arising out of the particular activities of the defendant in the forum state . . . ." *ClearOne*, 2016 UT 16, ¶ 8 (alterations in original) (citation omitted). Plaintiffs argue that Defendants are subject to specific jurisdiction.

¶ 36  The Due Process Clause of the Fourteenth Amendment of the United States Constitution permits a state to exercise personal jurisdiction over a party only when the party has "minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash. Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783, 788 (1984) (citation omitted).

¶ 37  "For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In *Walden*, the Supreme Court examined "[t]wo related aspects" of "the relationship among the defendant, the forum, and the litigation" to determine whether jurisdiction is proper. *Id.* (citation omitted). First, we must consider whether "the relationship . . . arise[s] out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* (citation omitted). To establish

---

[12] In their complaint, Plaintiffs argued that "[p]ersonal jurisdiction [over] Defendants is proper in Utah" because "[e]ach Defendant has continuous and systematic business contacts with Utah." In their response to Defendants' motion to dismiss, however, Plaintiffs argued that "[f]or the purposes of this response, Plaintiffs do not rely on general jurisdiction." The district court noted this statement in its order and concluded that "[w]hether for purposes of this motion or otherwise, it is clear this court lacks general personal jurisdiction over defendants." Plaintiffs have not challenged this conclusion and they aver that only "specific personal jurisdiction . . . is at issue in this appeal."

personal jurisdiction, it is "insufficient to rely . . . on the 'unilateral activity' of a plaintiff." *Id.* at 286 (citation omitted). Rather, "[a] forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Id.* Second, we must consider whether a defendant's contacts are "with the forum State itself, not . . . with persons who reside there." *Id.* at 285. A plaintiff "cannot be the only link between the defendant and the forum." *Id.* "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290.

¶ 38 Focusing solely on a non-resident-defendant's contacts with the plaintiff "impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis." *Id.* at 289. "Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.* "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286. A defendant's contacts with the forum state "may be intertwined with his transactions or interactions with the plaintiff or other parties. But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* Additionally, "physical presence in the forum is not a prerequisite to jurisdiction," but "physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.* at 285.

¶ 39 The distinction between a defendant's contacts with the plaintiff and a defendant's contacts with the forum state itself is difficult to grasp in the abstract.[13] In *Walden*, the Supreme Court

---

[13] When examined in isolation, this language—that a defendant must have contacts "with the forum State itself"—could be read to suggest that a defendant must have contacts with the forum unrelated to the plaintiff and cause of action at issue. When read in context, the Supreme Court's meaning clarifies. "Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Walden*, 571 U.S. at 286. And, in *Walden*, the Court was presented with Georgia-based Drug

(continued . . .)

explained the distinction in context of its prior decisions. *Id.* at 284–85. The *Walden* court opined that one way a defendant could be found to have minimum contacts with a forum would occur when a defendant "purposefully 'reach[ed] out beyond' [its] State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Id.* at 285 (first alteration in original) (citation omitted). The Court also pointed to *Calder* as a prime example of "ample" forum contacts. *Id.* at 287.

¶ 40 In *Calder*, a California actress brought a libel suit in a California state court against National Enquirer employees who worked at its headquarters in Florida. 465 U.S. 783, 784–85 (1984). The claims arose from an article defendants wrote and edited in Florida for publication in the National Enquirer, a national weekly "newspaper." *Id.*

¶ 41 The *Calder* court examined the contacts that the defendants created with the forum state, noting that: "[t]he defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; [and] they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State." *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 788–89). Furthermore, "the 'brunt' of that injury was suffered by the plaintiff in that State." *Id.* "In sum, California [was] the focal point both of the story and of the harm suffered." *Calder*, 465 U.S. at 789.

---

Enforcement Administration agents who interacted with the Nevada plaintiffs in Georgia. *Id.* at 279–81. There, it was not sufficient that the agents knew that plaintiffs lived in Nevada and that the effects of their actions would be felt in Nevada. *Id.* at 289–90. "The proper question" according to the Court is "whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. In other words, the defendants had contacts with Nevada residents, but these contacts were "random, fortuitous, and attenuated" such that they could not confer jurisdiction over the defendant. *Id.* at 285. They did not have contacts with those Nevada residents in Nevada—whether "in person or through an agent, goods, mail, or some other means." *Id.* at 285. And without contacts with plaintiffs in the forum state, the Supreme Court was unwilling to uphold the Ninth Circuit Court of Appeals' decision that the exercise of specific jurisdiction was proper.

¶ 42 This aspect of the minimum contacts inquiry examines the connection that the defendant creates with the forum state itself. But, when considering specific jurisdiction, this connection must also be tied to the controversy underlying the litigation. "In order for a court to exercise specific jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1781 (2017) (alteration in original) (citation omitted).

¶ 43 In *Bristol-Myers Squibb*, the Supreme Court examined the California Supreme Court's "sliding scale approach to specific jurisdiction" and determined that this approach does not jibe with jurisdictional jurisprudence. *Id.* at 1778, 1781 (citation omitted). In that case, a group of 678 plaintiffs—86 from California and 592 from 33 other states—filed eight separate complaints, all asserting claims under California law, in a California Superior Court, alleging that a drug Bristol-Myers Squibb distributed had damaged their health. *Id.* at 1778. The non-resident plaintiffs did not allege that they obtained the drug through California physicians or from any California source. *Id.* Nor did they claim that their injury occurred in California. *Id.* Bristol-Myers Squibb asserted that the California court lacked personal jurisdiction as to the non-resident plaintiffs' claims. *Id.* The California Supreme Court disagreed. *Id.* Under the California Supreme Court's approach to specific jurisdiction, "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim." *Id.* (citation omitted).

¶ 44 The United States Supreme Court concluded that the sliding scale approach "resemble[d] a loose and spurious form of general jurisdiction," and is "difficult to square with . . . precedent[]." *Id.* at 1781. The Court noted a lack of "any adequate link between the State and the nonresidents' claims. . . . The mere fact that *other* plaintiffs were prescribed, obtained, and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* The Court cautioned that "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." *Id.* (omission in original) (citation omitted). "This remains true even when third parties (. . . the plaintiffs who reside in California) can bring claims similar to those brought by the nonresidents." *Id.* The Court concluded that "what is missing . . . is a connection between the forum and the specific claims at issue." *Id.*

¶ 45   *Bristol-Myers Squibb* clarified two principles. First, to assert specific jurisdiction, a plaintiff must demonstrate not only the connection between the defendant and the forum, but also the connection between the forum and the claims at issue. *Id.* at 1781. Second, a plaintiff cannot rely on the connection of another plaintiff's claims to the forum; courts must independently analyze the connection between each plaintiff's claim and the forum state. *Id.* at 1783.

¶ 46   And these principles build on those that the court clarified in *Walden*, which relate to the relationship between the defendant and the forum state: whether "the relationship among the defendant, the forum, and the litigation . . . arise[s] out of contacts that the 'defendant *himself*' creates with the forum State," and whether a defendant's contacts are "with the forum State itself, not . . . with persons who reside there." *Walden*, 571 U.S. at 284-85.

## II. The Effects Test Analysis
## of Minimum Contacts

¶ 47   In their briefing, the parties rely, quite understandably, on the way we framed the inquiry in *ClearOne, Inc. v. Revolabs*, 2016 UT 16, 369 P.3d 1269. Notably, both parties employ a minimum contact analysis known as the "effects" test, which we adopted in *Pohl, Inc. of America v. Webelhuth*, 2008 UT 89, ¶¶ 23–27, 201 P.3d 944, and later narrowed in *ClearOne*, 2016 UT 16, ¶ 23.[14]

¶ 48   In *ClearOne*, we noted that the "'effects test . . . has three prongs: 'the defendant must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state.'" *ClearOne*, 2016 UT 16, ¶ 11 (citation omitted). In *ClearOne*, we reasoned that "[u]nder *Walden*, the proper application of the 'effects' test looks beyond both the plaintiff's connections to the forum state and the plaintiff's injury to whether the defendant has 'create[d] a substantial connection with the forum State.'" *Id.* ¶ 22 (second alteration in original) (quoting *Walden*, 571 U.S. at 284). And we noted that *Walden* "clarified that the effects of an alleged tort must be felt by more than just a plaintiff with significant contacts with the forum state—they must be felt in some broader sense by the forum state itself." *Id.*

---

[14] The district court also, again quite understandably, based its analysis on the effects test we outlined in *ClearOne*.

¶ 49   *ClearOne* represents our effort to reconcile *Pohl's* version of the effects test with the Supreme Court's guidance in *Walden*.[15] The parties' briefing suggests that we need to underscore what we said in *ClearOne*. This is because a myopic focus on the effects test's language, at the expense of *Walden's* explanation, creates the potential to distort the jurisdictional inquiry.

¶ 50   In *ClearOne*, we explained that "the 'express aiming' prong of the 'effects' test could not be satisfied simply by showing that the defendant targeted an entity known to be a resident of the forum."

---

[15] Other courts have similarly wrestled with how *Walden* may have impacted the effects test. For example, the Ninth Circuit Court of Appeals applied the effects test in a copyright infringement claim, but acknowledged that "[f]ollowing *Walden*, . . . while a theory of individualized targeting may remain relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what *Walden* requires." *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1066, 1070 (9th Cir. 2017).

Other courts have grappled with the reach of the effects test. The Eleventh Circuit Court of Appeals explained that "[t]he *Calder* effects test is satisfied when the defendant commits an intentional tort expressly aimed at the forum that causes a reasonably foreseeable injury in the forum," but noted that "[t]he 'effects test' applies only in intentional tort cases." *Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd.*, 722 Fed. App'x 870, 882 (11th Cir. 2018) (citation omitted).

The Tenth Circuit Court of Appeals has examined *Walden* and questioned the reach of the effects test, opining that "the [United States] Supreme Court has recently suggested that the *Calder* effects test does not extend beyond the defamation context." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 916 n.34 (10th Cir. 2017) (citing *Walden*, 571 U.S. at 287). But other courts do not read *Walden* to have narrowed the test so significantly. *See Biliack v. Paul Revere Life Ins. Co.*, 265 F. Supp. 3d 1003, 1006–09 (D. Ariz. 2017) (applying the effects test in the context of claims for breach of contract, breach of the obligation of good faith and fair dealing, and the tort of insurance bad faith); *Christie v. Nat'l Inst. for Newman Studies*, 258 F. Supp. 3d 494 (D.N.J. 2017) (applying the effects test in the context of tort claims alleging violations of the Computer Fraud and Abuse Act, Invasion of Privacy, and violation of New Jersey's Computer Related Offense Act).

*ClearOne*, 2016 UT 16, ¶ 20. And we noted that the Supreme Court had instructed that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* ¶ 21 (alteration in original) (quoting *Walden*, 571 U.S. at 290). This connection must "arise[] out of contacts that the 'defendant *himself*' creates . . . with the forum State," in relation to the claims or litigation. *Id.* ¶ 17 (citation omitted) (internal quotation marks omitted). The *Walden* court suggested that the type of contacts that would meet this standard would include "entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State" and "physical entry into the State—either by the defendant in person, or through an agent, goods, mail, or some other means." *Walden*, 571 U.S. at 285 (citation omitted).

¶ 51   And with regards to the "brunt of the injury" prong, in *ClearOne* we noted that *Walden* explained that "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." 2016 UT 16, ¶ 21. (citation omitted). Therefore, we emphasize that allegations of out-of-state conduct that happen to have effects that ripple into Utah cannot, by themselves, establish specific jurisdiction.

¶ 52   We also address our statement that *Walden* "clarified that the effects of an alleged tort must be felt by more than just a plaintiff with significant contacts with the forum state—they must be felt in some broader sense by the forum state itself." *ClearOne*, 2016 UT 16, ¶ 22. For the reasons discussed in footnote 13, we think this overstates *Walden*'s holding. *Walden* focuses the inquiry on the defendant and the litigation-related contacts she makes with the forum. Even if the effects are felt by just the plaintiff in the state, if those effects are the product of a defendant purposefully reaching into the state, specific jurisdiction may exist.

### III. Specific Jurisdiction over Defendants

¶ 53   With these principles in mind, we turn to the district court's ruling. Plaintiffs argue that the district court erred by concluding that Plaintiffs failed to meet their threshold burden of establishing specific personal jurisdiction. Defendants counter that the district court correctly dismissed Plaintiffs' claims for lack of personal jurisdiction because Plaintiffs did not show that any defendant engaged in any conduct in Utah that gives rise to the claims at issue. Specifically, Defendants argue that Plaintiffs cannot establish jurisdiction under the effects test because Plaintiffs "did not show that a conspiracy to manipulate Raser's stock price was

'expressly aimed' at Utah" and "cannot show that Defendants caused harm that they knew was likely to be suffered in Utah."

¶ 54   Using the *ClearOne* framework, Plaintiffs contend that they have made a prima facie showing of specific personal jurisdiction. According to Plaintiffs, "[t]here is no question that the three predicate elements of the 'effects' test are met" because Defendants are alleged to have "(1) committed intentional acts (stock manipulation and communications fraud which are, *inter alia*, predicate acts under the UPUAA); (2) expressly aimed at Utah (Raser and the other [Plaintiffs]); (3) causing harm, the brunt of which is suffered—and which the [Defendants] knew was likely to be suffered—in Utah."

¶ 55   The district court rejected this argument and concluded that Plaintiffs "ha[d] not shown that [D]efendant's conduct was expressly aimed at Utah," and that they therefore failed to satisfy the second-prong of the effects test. We therefore focus our discussion to whether the district court correctly concluded that Plaintiffs had not pled that Defendants expressly aimed their conduct at Utah.

¶ 56 Plaintiffs appear to argue that Defendants' conduct satisfied the "express aiming" prong because the "conduct was intended to manipulate the price of Raser's stock which trades on a national stock exchange in every state, including Utah." Plaintiffs also argue that Defendants "knew that Raser's headquarters was in Utah, and, accordingly, that a large number of insiders were located in Utah and any buy-back of Raser's stock would originate from this State." And Plaintiffs allege that "the scheme was intended to drive [Raser] into bankruptcy so that [Defendants] could realize the full benefit and avoid detection of their illegal short-selling activities." Plaintiffs also attempt to connect Defendants' actions to Utah by describing impacts that they allege occurred more broadly—"More than 250 Utah shareholders had millions in equity destroyed," "More than 40 Utah residents lost their jobs," "At least 499 Utah creditors lost money from Raser's bankruptcy," "The State of Utah lost more than $1.7 million and Beaver County lost nearly $2 million," "Six other Utah counties . . . lost money," and "Dozens of Utah companies lost millions of dollars."

¶ 57   Although this type of showing might have been sufficient to establish jurisdiction under the effects test we envisioned in *Pohl*, *see Pohl, Inc. of Am. V. Webelhuth*, 2008 UT 89, ¶¶ 32, 35, 201 P.3d 944; *see also ClearOne, Inc. v. Revolabs, Inc.*, 2016 UT 16, ¶ 15 & n.34, 369

P.3d 1269, [16] it does not meet the standard the Supreme Court outlined in *Walden. ClearOne*, in accordance with *Walden*, instructs that the defendant's conduct must connect him to the forum in some meaningful way. 2016 UT 16, ¶¶ 21–26. Allegations of price manipulation on a national exchange do not, standing alone, describe conduct that connects any individual defendant to Utah in a meaningful way. General allegations of out-of-state conduct whose effects ripple into Utah cannot, by themselves, establish specific jurisdiction.

¶ 58 *Walden* illustrates that these kinds of ripple effects, divorced from conduct aimed at a plaintiff in the forum state, are insufficient. There, it was "undisputed that no part of petitioner's course of conduct occurred in Nevada." *Walden v. Fiore*, 571 U.S. 277, 288 (2014). "Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* at 289. The Supreme Court rebuked the Ninth Circuit's conclusion that the "petitioner's knowledge of respondents' 'strong forum connections'" and that "respondents suffered foreseeable harm in Nevada, satisfied the 'minimum contacts' inquiry." *Id.* (citation omitted). The Supreme Court explained that "[s]uch reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.*

¶ 59 *Walden* therefore makes clear that a defendant's knowledge of a plaintiff's connections to the forum state coupled with the defendant's suffering a foreseeable harm, cannot, by themselves, satisfy the minimum contacts analysis. Plaintiffs' allegations that Defendants "knew that Raser's headquarters was in Utah, and, accordingly, that a large number of insiders were located in Utah," and that "the scheme was intended to drive [Raser] into bankruptcy," which resulted in injuries suffered in Utah, without more, is insufficient.

¶ 60 Indeed, it is difficult to distinguish Plaintiffs' allegations from those the Supreme Court found wanting in *Walden*. In *Walden*, the defendant's seizure of the plaintiffs' cash in Georgia did not give

---

[16] In *ClearOne* we noted that *Pohl* "suggests that there is no need to examine whether the defendant had any contacts with the forum state besides the injury felt by the plaintiff, because any intentional tort committed against a resident of a forum state can be of itself a sufficient minimum contact." *ClearOne*, 2016 UT 16, ¶ 15.

rise to jurisdiction in Nevada, even though the Drug Enforcement Administration agent knew that the plaintiffs lived in Nevada and would suffer the consequences of that seizure in Nevada. *Walden*, 571 U.S. at 288–91. Plaintiffs similarly allege that the effects of the short sales, which are not alleged to have taken place in Utah, would be felt by Raser in Utah.

¶ 61 *Walden* requires more. And *Walden* lists some of the kinds of contacts that might suffice: "physical entry into the State—either by the defendant in person, or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.* at 285. To establish specific jurisdiction, each plaintiff must establish an adequate link between themselves and each defendant, and an adequate link between Utah and their claims.

¶ 62 Our ability to assess whether Utah can assert jurisdiction over any of Defendants is compromised by the fact that the district court analyzed Plaintiffs' claims and Defendants' contacts with Plaintiffs collectively. Six plaintiffs—Raser, Kelly Trimble, Mark Sansom, Ocean Fund, Warner Investments,  and Maasai—brought claims against Merrill, Merrill Clearing, Merrill International, Goldman, Goldman Clearing, and Goldman International.

¶ 63 To test jurisdiction, the district court should have separately analyzed each plaintiff, its claims, its claims' connections to the forum, and each defendant's connections to the forum in relation to those claims. The district court's failure to analyze jurisdiction with that specificity means that we do not have the record before us that would allow us to review with any confidence the district court's conclusion that jurisdiction is improper.

¶ 64 Our insistence on this type of analysis assumes importance here, because it appears, based upon what we do have in front of us, that Plaintiffs may have put forward a prima facie case for the assertion of jurisdiction over Merrill with respect to the claims Ocean Fund advances. Although not entirely clear from what is in the appellate record, it appears that Ned Warner, as 100 percent owner and managing member of Ocean Fund, contacted Merrill after Raser's CEO approached him about releasing two million of his shares for the CBO. Merrill "represented to [Warner] that [his] shares would only be used by participants in the CBO," and Warner stated in an affidavit that "[i]n reliance upon [Merrill's] representations, I opened an account at Merrill['s] . . . Provo, Utah office and had my shares delivered for deposit into my newly opened account."

¶ 65 Warner explained that he "signed various documents to open the account, including the Master Securities Loan

Agreement. . . ." And Warner had the stock certificates delivered to a Merrill office located in Provo, Utah. Warner exchanged several emails and telephone calls with Merrill in the months following the release of his stock, and entered into a written agreement regarding the limited use of his stock. After repeatedly reaching out to Merrill to confirm that his stocks were not being used in a short sale, Warner received written-confirmation from Merrill that his stock would not be used to short Raser.

¶ 66 Because of the lack of factual development in the record before us—for example, the record is unclear as to the extent to which Merrill initiated any of the contacts with Ocean Fund as well as the volume of the emails and telephone calls—we do not opine on whether jurisdiction over Merrill is proper. But we emphasize that this highlights that individualized examination of the contacts and claims might yield disparate results for different defendants. We remand to permit the district court to determine whether sufficient minimum contacts exist to permit the exercise of specific jurisdiction over any defendant on any of plaintiff's claim.

¶ 67 We also flag one aspect of the district court's order to provide guidance on remand. In its order, the district court hinted at the potential exercise of jurisdiction over Merrill:

> [Merrill] had stock loan agreements with Raser shareholders, one of which is Plaintiff Ocean Fund, LLC, and plaintiffs contend that [Merrill] breached those agreements by using borrowed Raser shares to support short sales rather than hedging. If Ocean Fund were asserting a claim for breach of those agreements, or any claim that could fairly be said to arise out of a breach of those agreements, the court would have personal jurisdiction over [Merrill] to entertain a claim by Ocean Fund. But plaintiffs do not allege a breach of those agreements. Their [Utah Pattern of Unlawful Activity Act] claim is considerably more involved and, by necessity, requires participation by other defendants over whom the court cannot exercise personal jurisdiction . . . .

¶ 68 To the extent the district court intended to suggest that contacts associated with contract formation can never be used as a basis to exercise specific jurisdiction over a tort claim related to that contract, we note that courts have expressed different views on the topic and that we appear to have not explicitly offered our opinion.

¶ 69  In *Toussant v. Williams*, the United States District Court for the Eastern District of Pennsylvania acknowledged that contacts arising out of a contractual relationship may be sufficient contacts to establish personal jurisdiction over a tort claim. 62 F. Supp. 3d 417, 425–27 (E.D. Pa. 2014). In *Toussant*, the plaintiff entered into several contracts for health related services with the defendant. *Id*. at 420. The plaintiff brought several contract and tort claims against the defendant after allegedly suffering racial antagonism, unwanted touching, and harassment at the hands of the defendant, among other things. *Id*. at 420–21. The defendant moved to dismiss for lack of personal jurisdiction, but the plaintiff responded that "her injuries relate directly to the contracts she had entered [into] with [d]efendant and that these injuries would not have occurred but for the . . . contractual relationship." *Id*. at 425. The court analyzed each of the tort claims, and concluded that some of the tort claims were not sufficiently related to the contracts and therefore the plaintiff could not rely on the defendant's contacts with respect to the contracts to establish specific jurisdiction. *Id*. at 425–26. However, the court concluded that the plaintiff's fraud and fraudulent inducement claims did relate to the contracts, because plaintiff "allege[d] that she entered the contracts in reliance upon [d]efendant's fraudulent representations." *Id*. at 426.

¶ 70  The Third Circuit has concluded that "[i]t is enough [to establish the existence of minimum contacts] that a meaningful link exists between a legal obligation that arose in the forum and the substance of the plaintiffs' claims." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 324 (3d Cir. 2007). In *O'Connor*, the court examined contacts arising out of a contractual relationship and concluded that although the "claims sound in tort, not contract," because the plaintiffs claimed a breach of duty identical to a duty assumed in a contract between plaintiffs and the defendant, such an "intimate . . . link justifies the exercise of specific jurisdiction as a quid pro quo" for the defendants' "right to form binding contracts in [the forum state]." *Id*. at 323–24. However, the Third Circuit has also cautioned that "[i]n analyzing jurisdictional contacts on a claim-by-claim basis, [the court] ha[s] been careful to note that forum contacts supporting a contract claim are not necessarily relevant to establishing jurisdiction over a tort claim." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 104 (3d Cir. 2004).

¶ 71  Because the parties have not briefed the issue, we do not tackle it in this opinion, but to the extent the district court intended to apply a rule that contacts arising out of a contract may never support specific jurisdiction over a tort action, we emphasize that we have never decided that question.

## IV. Conspiracy Theory of Jurisdiction

¶ 72  Plaintiffs also argue that the district court erred by refusing to employ the conspiracy theory of jurisdiction to exercise specific jurisdiction over all Defendants. Plaintiffs argue that under a conspiracy theory of jurisdiction, "Merrill's Utah-based activities to obtain the infusion of new stock necessary to support their illegal scheme" can be imputed to the other members of the conspiracy, who might otherwise lack sufficient minimum contacts with Utah. The district court refused to adopt a conspiracy theory of jurisdiction, because we declined to do so in *Pohl, Inc. of America v. Webelhuth*, 2008 UT 89, 201 P.3d 944. In *Pohl* we stopped short of adopting the conspiracy theory of jurisdiction because we "s[aw] no need to adopt [the theory] . . . because the *Calder* 'effects' test adequately addresse[d] the issue" in that case. 2008 UT 89, ¶ 29.[17]

¶ 73  We invited supplemental briefing and heard additional argument on the question of whether Utah should recognize a conspiracy theory of jurisdiction. To answer that question we start with the Utah Nonresident Jurisdiction Act (Act). The Act directs us to "appl[y] [the statute] so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." UTAH CODE § 78B-3-201(3). "This court has explicitly upheld that policy." *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 2000 UT 71, 969 P.2d 430, 433. Thus, if we conclude that there is a conspiracy theory of jurisdiction that comports with due process principles, the legislature has already made the policy decision that we must interpret the Act to include it.

¶ 74  Plaintiffs argue that a conspiracy theory of jurisdiction comports with due process "if the co-conspirators to whom [the] minimum contacts are imputed knew or should have known that overt acts would occur in the forum state." Plaintiffs posit that "there potentially are circumstances where jurisdiction would be proper even if a co-conspirator had no reason to know that overt acts would occur in a specific forum." A court using this analysis, Plaintiffs

---

[17] "The basic premise of the conspiracy theory of personal jurisdiction is that certain acts of one co-conspirator that are done in furtherance of a conspiracy may be considered to be the acts of another co-conspirator for purposes of determining whether a forum state may exercise personal jurisdiction over the other co-conspirator." *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 484 (Md. 2006).

assert, "can make an individualized assessment of each defendant's knowledge of forum-related overt acts," which would meet the demands of due process.

¶ 75   Defendants assert that "for specific jurisdiction to exist over a non-resident defendant, the relationship between the defendant, the forum, and the litigation must 'arise out of contacts that the defendant *himself* create[d] with the forum State.'" (Quoting *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014)). Defendants therefore contend that "any exercise of personal jurisdiction over a defendant based on the acts of a third party, including an alleged co-conspirator, would violate due process." And Defendants argue that a conspiracy theory of jurisdiction is incompatible with the requirements of due process because "courts analyzing specific personal jurisdiction must conduct a separate analysis for *each* defendant." (Citing *Bristol-Myers Squibb v. Superior Court of Cal.*, 137 S.Ct. 1773, 1783 (2017)).

¶ 76   We conclude that a conspiracy theory of jurisdiction can satisfy due process concerns. *Walden* clarifies that the "contacts that the 'defendant *himself*' creates with the forum State," must be the basis of specific jurisdiction, 571 U.S. at 284 (citation omitted), but recognizes that these contacts may be through a third-party, *id.* at 286. The Supreme Court reasoned that a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties," only drawing the line that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* at 286.[18] The Supreme Court also anticipated that an agency relationship may give rise to contacts sufficient to subject a defendant to personal jurisdiction, as *Walden* points to a defendant's acts "through an agent" as an example of one kind of "relevant contact" that may subject an individual to jurisdiction. *Id.* at 285.

---

[18] This is a principle that originates from *International Shoe* in which the Supreme Court held that "[s]ince the corporate personality is a fiction . . . the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it." *Int'l Shoe Co. v. Wash. Office of Unemployment Comp. &Placement*, 326 U.S. 310, 316 (1945). "[T]he terms 'present' or 'presence' are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process." *Id.* at 316–17.

¶ 77 *Walden* also approvingly discusses *Calder v. Jones*, 465 U.S. 783 (1984), a case that involved a relationship with a third-party that gave rise to, in part, defendant's minimum contacts with the forum state sufficient to give rise to jurisdiction. *Walden*, 571 U.S. at 286–89. In *Calder*, the out-of-state defendants argued that their contacts with California were insufficient for personal jurisdiction because "their employer was responsible for circulation of the article" that formed the basis of the plaintiff's libel claims. *Id.* at 288 n.7 (citing *Calder*, 465 U.S. at 789).

¶ 78 The Court rejected this argument, responding that the defendants "expressly aimed" their allegedly tortious actions at California "because they knew" their employer, the National Enquirer, had its largest circulation in California, and that the article would "have a potentially devastating impact" there. *Id.* (citing *Calder*, 465 U.S. at 789–90). While the defendants were "not to be judged according to their employer's activities [in California,] . . . their status as employees d[id] not somehow insulate them from jurisdiction." *Calder*, 465 U.S. at 790. The defendants' relationship to the employer who circulated the article in California therefore formed part of the basis for jurisdiction over the defendants. *See id.*

¶ 79 *Walden* and *Calder* therefore indicate that the acts of a third-party—such as an agent—can, in some circumstances, provide a basis to exercise jurisdiction over an out-of-state defendant.[19] And

---

[19] *Bristol-Myers Squibb* leaves open the door that the relationship between a defendant and a third-party may provide a basis to exercise jurisdiction, so long as that relationship is relevant to the case at hand. 137 S. Ct. 1773.

In *Bristol-Myers Squibb*, the non-resident plaintiffs contended that because the defendant out-of-state pharmaceutical company contracted with a company in the forum state to distribute the drug in question nationally, there was a sufficient basis for personal jurisdiction over the pharmaceutical company in the forum state. *Id.* at 1783. The Court quoted *Walden*: "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." *Id.* (alteration in original) (quoting *Walden*, 571 U.S. at 286). "What is needed—and what is missing here—is a connection between the forum and the specific claims at issue." *Id.*

But the *Bristol-Myers Squibb* analysis did not reason that the pharmaceutical company's contractual relationship with an in-state company could never be relevant to the specific jurisdiction analysis. Rather, the Court stated that it had not been alleged that the

(continued . . .)

because a conspiracy is a type of agency relationship, an act taken during the course of a conspiracy relationship may lead to specific personal jurisdiction over a defendant.[20] *See State v. Erwin*, 120 P.2d 285, 299 (Utah 1941) (holding in a criminal context that "when [a conspiracy] is proved, each conspirator becomes the agent of his co-conspirator"); *see also Pyper v. Reil*, 2018 UT App 200, ¶ 16, 437 P.3d 493 ("[A] conspirator may be liable for a co-conspirator's unlawful acts in furtherance of the conspiracy.")[21]

---

pharmaceutical company "engaged in relevant acts together" with the in-state company. *Id.* And the non-resident plaintiff failed to put forward any evidence of how the in-state company was connected to the medication that the plaintiffs received. *Id. Bristol-Myers Squibb* therefore stands for the proposition that "the bare fact" that there is a relation between an in-state individual and out-of-state party does not give rise to specific jurisdiction over the out-of-state defendant, not that a relationship between an in-state individual and an out-of-state party can never give rise to specific jurisdiction. *See id.*

[20] The practical application of this is that if Plaintiffs can establish specific jurisdiction over a single defendant, they might be able to demonstrate that that defendant was acting as an agent of some of the other defendants. For example, if jurisdiction can be properly exercised over Merrill, *Walden* permits plaintiffs to attempt to show that Merrill acted as an agent for Merrill Pro, Merrill International, and Goldman Sachs, and that those defendants expressly aimed their conduct towards Utah through Merrill. *See Walden*, 571 U.S. at 285.

[21] While Utah courts have apparently not yet opined that conspirators are considered agents for jurisdictional purposes, other jurisdictions have already reached this conclusion. *See, e.g., Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 431 (E.D.N.Y. 2012) ("New York [c]ourts have defined 'agent' broadly to include not only a defendant's formal agents, but also, under certain circumstances, a defendant's co-conspirators." (alteration in original) (citation omitted) (internal quotation marks omitted)); *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992) ("It is not an arcane concept that conspirators are considered agents for jurisdictional purposes. Indeed, courts have defined 'agent' broadly to include not only a defendant's non-resident's formal agents but also a defendant's co-conspirators."); *Am. Int'l Grp., Inc. v. Greenberg*, 965 A.2d 763, 815 (Del. Ch. 2009) (interpreting the term 'agent' in Delaware's long-arm statute to include a co-conspirator); *Mackey*, 892 A.2d at 495 (holding that "one co-conspirator may be the 'agent' of

(continued . . .)

¶ 80 *Mackey v. Compass Marketing*—while a pre-*Walden* case—provides a helpful discussion of the conspiracy theory. 892 A.2d 479 (Md. 2006). The Maryland court concluded that the "relationship between co-conspirators required by the conspiracy theory" ensures that if a co-conspirator is subjected to personal jurisdiction of a forum state, that a co-conspirator "has fair warning that he or she could be subjected to suit in the forum state sufficient to satisfy the due process concerns about fair warning of the possibility of suit." *Id.* at 489. The Maryland court explained that the conspiracy theory of jurisdiction does not violate the Supreme Court's command that personal jurisdiction not be based on the unilateral actions of a third party:

> By the terms of the conspiracy theory, a co-conspirator to whom the acts of another co-conspirator are attributed must have agreed to participate in a conspiracy that he or she could reasonably have expected at the time of agreement to involve the forum-related actions attributed to him or her. The acts attributed are not simply unilateral acts of the co-conspirator who literally performed them, but are also the acts of the other co-conspirator.

*Id.* at 490–91.

¶ 81 The Maryland court articulated the test for conspiracy jurisdiction:

> (1) two or more individuals conspire to do something
> (2) that they could *reasonably expect* to lead to consequences in a particular forum, if
> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state, then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

another co-conspirator within the meaning of [Maryland's long-arm statute]").

*Id.* at 486 (emphasis added) (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982). The court concluded that if this test is satisfied, the "overt acts" of one co-conspirator are "attributable to the other co-conspirator[]," who becomes subject to personal jurisdiction in the forum, "even if they have no direct contacts with the forum." *Id.* (citation omitted).

¶ 82 In *Tricarichi v. Cooperative Rabobank, U.A.*, the Nevada Supreme Court affirmed the viability of the conspiracy theory of jurisdiction after *Walden* and adopted a test similar to that in *Mackey.* 440 P.3d 645 (Nev. 2019).[22] The Nevada Supreme Court required that the plaintiff plead with particularity that the defendant "could have reasonably expected at the time of entering into the conspiracy that their actions would have consequences in the forum state." *Id.* at 654. "To support jurisdiction based on conspiracy theory and satisfy due process," the Nevada court adopted a test that requires a plaintiff to show "(1) an agreement to conspire, (2) the acts of co-conspirators are sufficient to meet minimum contacts with the forum, and (3) the co-conspirators reasonably expected at the time of entering into the conspiracy that they would be subject to jurisdiction in the forum state." *Id.* at 653 (citing *Gibbs v. PrimeLending*, 381 S.W.3d 829, 832 (Ark. 2011); *Mackey*, 892 A.2d at 489 ).[23]

¶ 83 Other courts that have adopted or affirmed the conspiracy theory of jurisdiction after *Walden* have stated the inquiry differently and focused on whether the defendant knew (or in some cases, should have known) of her co-conspirator's acts in the forum state.[24]

---

[22] Tennessee also affirmed the adoption of this form of the conspiracy theory of jurisdiction in a post-*Walden* case. *See First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 394–95 (Tenn. 2015).

[23] The Nevada Supreme Court noted that the Nevada court had previously recognized the conspiracy theory of jurisdiction in a pre-*Walden* case, *Davis v. Eighth Judicial Dist. Court*, 629 P.2d 1209, 1211, 1213 (Nev. 1981), *superseded by rule on other grounds*, as recognized in *Hansen v. Eighth Judicial Dist. Court*, 6 P.3d 982, 983-85 (Nev. 2000). Although we look to Nevada's test to formulate ours, we opt to state the inquiry in terms that are perhaps more reflective of the way the United States Supreme Court spoke about jurisdiction in *Walden*.

[24] Other jurisdictions have also, post-*Walden*, applied a form of the conspiracy theory of jurisdiction. But it appears they have done so without explicitly evaluating the potential impact of *Walden* on the

(continued . . .)

For example, the United States District Court for the District of Columbia concluded that "following *Walden*, a plaintiff who seeks to establish jurisdiction over a defendant based on a co-conspirator's contacts must plead, at a minimum, that the defendant *knew* his co-conspirator was carrying out acts in furtherance of the conspiracy *in the forum.*" *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 91 (D.D.C. 2017); *accord Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 185–86 (D.D.C. 2018) ("[I]f any conspiratorial jurisdiction survives *Walden*, a plaintiff pursuing such a theory must allege that the defendant knew of the co-conspirator's acts in the forum."). The United States District Court for the Eastern District of Pennsylvania adopted a conspiracy theory of jurisdiction which required that a plaintiff "allege that substantial acts in furtherance of the conspiracy occurred within the forum state and that the foreign defendant was, or should have been, aware of them." *United Healthcare Servs., Inc., v. Cephalon, Inc.*, No. 17-555, 2018 WL 878766, at *3 (E.D. Pa. Feb. 13, 2018) (citation omitted). And a New Jersey court reached a similar conclusion, holding that the plaintiffs had not satisfied the conspiracy theory of jurisdiction because there was not "evidence the[] defendants knew or should have known their alleged co-conspirators would take action in this State." *Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., L.L.C.*, 160 A.3d 44, 90 (N.J. Super. Ct. App. Div. 2017).[25]

---

test. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86 (2d Cir. 2018); *Garcia v. Peterson*, 319 F. Supp. 3d 863, 888 (S.D. Tex. 2018); *My Size, Inc. v. Mizrahi*, 193 F. Supp. 3d 327, 333 (D. Del. 2016); *BeoCare Grp., Inc. v. Morrissey*, 124 F. Supp. 3d 696, 702 (W.D.N.C. 2015).

[25] Defendants assert that it is not enough that a defendant has knowledge of her co-conspirator's acts in the forum state. They rely on *Walden*'s reasoning that a defendant's knowledge of a plaintiff's "strong forum connections" and foreseeability of harm to the plaintiff in the forum state cannot satisfy the minimum contacts requirement of due process. 571 U.S. at 289 (citation omitted). The Court concluded that such reasoning "improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.* Defendants conflate a defendant's knowledge of her *co-conspirator* with a defendant's knowledge of the *plaintiff*, however. A defendant has taken an action to become part of a conspiracy, which makes a defendant's knowledge of her co-conspirator's actions in the forum

(continued . . .)

¶ 84 Although both articulations seem to drive to the same conclusions, we prefer a test that focuses on the bedrock principle that for jurisdiction to comport with due process, an individual defendant's contacts must be "such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Although in the context of a conspiracy this will frequently boil down to what a defendant knew or should have known her co-conspirators were doing in the forum, there may well be cases in which the state of a defendant's knowledge may not perfectly align with her ability to reasonably anticipate being haled into court in a particular state.[26]

¶ 85 We therefore adopt a conspiracy theory of jurisdiction that focuses on whether the defendant could have reasonably anticipated being subject to jurisdiction in the forum state because of her participation in the conspiracy. To assert specific personal jurisdiction, the plaintiff must plead with particularity that (1) the defendant is a member of a conspiracy, (2) the acts of the defendant's co-conspirators create minimum contacts with the forum, and (3) the defendant could have reasonably anticipated that her co-conspirator's actions would connect the conspiracy to the forum state in a meaningful way, such that she could expect to defend herself in that forum.

¶ 86 Echoing concerns that have been expressed by other courts, we adopt this test "'warily' in order 'to prevent a broad extension of

state relevant to the jurisdictional inquiry, while the defendant's knowledge of the plaintiff's actions in the forum state is not.

[26] This, of course, suggests the question of what are the contacts that would cause a person to reasonably anticipate being haled into court. We emphasize that there is no special or different test for minimum contacts in this setting. As *Walden* instructs, "[W]e have upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State, or by circulating magazines to 'deliberately exploi[t]' a market in the forum State." 571 U.S. at 285 (second and fourth alterations in original) (citations omitted). "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Id.*

long-arm jurisdiction.;" *EIG Energy Fund*, 246 F. Supp. 3d at 90 (citation omitted). To curb the unintended and improper expansion of long-arm jurisdiction, courts applying this test will need to carefully assess the relationship between each individual defendant and the conspiracy to assess whether that individual defendant's relationship with the conspiracy and forum is such that she could reasonably anticipate being haled into court in the state. And a district court will need to assure itself that the exercise of jurisdiction over a co-conspirator is constitutional by examining the role the co-conspirator played in the conspiracy and the contacts between the conspirators and the forum state.

¶ 87 We also stress that plaintiffs must plead with specificity each element of the conspiracy theory of jurisdiction. *See Pohl*, 2008 UT 89. "[A] bare allegation of a conspiracy between the defendant and a person within the personal jurisdiction of the court is not enough to establish jurisdiction." *Id.* ¶ 30 (citation omitted) (internal quotation marks omitted). "[T]he plaintiff bears the burden of clearly alleging facts that demonstrate the existence of a conspiracy." *Id.* "[T]he complaint must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to show a civil conspiracy." *Id.* (citation omitted) (internal quotation marks omitted).[27] On remand, Plaintiffs will need to demonstrate that their pleadings conform to this standard.

## CONCLUSION

¶ 88 We vacate and remand to the district court with the instruction to examine each defendant's contacts with Utah, assess the conspiracy theory of jurisdiction, and determine how each plaintiff's claim relates to each defendant and Utah and to address, if necessary, Defendants' alternative arguments for dismissal.

---

[27] Other jurisdictions also require that a plaintiff satisfy a heightened pleading standard. *See, e.g.*, *Doe v. Hesketh*, 15 F. Supp. 3d 586, 595 (E.D. Pa. 2014) (holding that co-conspirator jurisdiction is recognized "where the plaintiff alleges specifically how co-conspirators related to each other in order to make a *prima facie* showing of personal jurisdiction").